**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, INC., as an organization; and GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., as an organization;<br><br>         Plaintiffs,<br><br>v.<br><br>BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia,<br><br>         Defendant. | Civil Action Case No. <u>2:16-cv-00219-WCO</u><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**(Section 2 of the Voting Rights Act (52 U.S.C. § 10301); First and Fourteenth Amendments to the United States Constitution)** |

## INTRODUCTION

1.     This action seeks declaratory and injunctive relief to stop an administrative policy employed by the Georgia Secretary of State that creates an illegal precondition to voter registration and, if not enjoined, will unlawfully disenfranchise tens of thousands of Georgia voting-eligible citizens, the vast majority of whom are minorities, in the November 2016 election and thereafter.

2.      Under the Georgia Secretary of State's current administrative policy, voter registration applications submitted by eligible voters are not added to the list of persons eligible to vote if certain identifying information does not match exactly with existing Georgia Department of Driver Services or Social Security Administration records.  Voter registration applicants whose information does not match those records are not allowed to cast a valid ballot unless they overcome a series of burdensome bureaucratic hurdles that deprive them of their fundamental right to vote, unless they happen to fall within a couple of narrow and arbitrary exceptions.  Those who cannot overcome these hurdles are denied the right to vote.

3.      Insistence on digit-by-digit and character-by-character exactitude when comparing information from one database with information in a different database is a notoriously unreliable method of verification in the elections context.  The "match" process is invariably plagued with errors, especially when the match criteria demand an exact match across numerous data fields. Mismatches between databases can result from innocuous mistakes such as omitting a hyphen or initial, and frequently result from no fault of the voter whatsoever.  Examples include data entry errors, typos, misreading of imperfect

2

handwriting by elections officials and computer glitches within the State's

registration system.  None of these common errors relate to a voter's eligibility to

vote, yet may routinely result in disenfranchisement under the Secretary's policy.

4.      There are many ways in which the records of eligible voters who

submit truthful and accurate registration applications will fail to "match."  For

example, voters who register in their married names will not match if their

driver's license or Social Security records are in their maiden names.  Voters with

compound last names will not be deemed a match if one database assigns part of

the last name to the middle name position, but the other does not.  Voters with

symbols in their name, such as accent marks, will not match if one database

recognizes those symbols and another does not.  Finally, the voter's records will

not be deemed a match if the person doing the data entry omits or transposes any

digits or characters when entering information from a voter registration

application into the Georgia statewide voter registration database (ENET), the

Georgia Department of Driver Services database (DDS database), or the Social

Security Administration's records.

5.      Eligible voters will also fail to match if there are small discrepancies

between their registration applications and the DDS or SSA records on file.  If

voters unwittingly reverse two digits in their driver's license number or omit a

hyphen when filling out their name, their records will not be deemed to match.

6.     Georgia is in a small and dwindling minority of states which are

going beyond the computerized list maintenance requirements of the Help

America Vote Act of 2002 to disenfranchise eligible voters using strict database

matching criteria.  *See*, *e.g.*, *Washington Ass'n of Churches v. Reed*, 492 F. Supp.

2d 1264 (W.D. Wash. 2006), *Stipulated Final Order and Judgment* (Mar. 16,

2007); "NASS Report: Maintenance of State Voter Registration Lists," National

Association of Secretaries of State, October 2009, at 11-14, *available at* nass-

survey-voter-reg-maintenance-Oct2009-3.pdf; Adam Skaggs, "'No Match'

Dropped after 4 of 6 Judges Fail," Brennan Center for Justice, Sept. 8, 2008,

*available at* http://www.brennancenter.org/blog/no-match-dropped-after-4-6-

judges-fail.

7.     The result of the voter registration verification protocol's

uncompromising adherence to exact match criteria as a prerequisite to registration

is that minor discrepancies are fatal for tens of thousands of voter registration

applications.  A conservative estimate indicates that more than 42,500 voter

registration applications have been suspended or rejected due to the verification

protocol between July 2013 and the present.[1]

8.    The burdens imposed by the voter registration verification protocol are disproportionately borne by Black, Latino, and Asian-American applicants.

9.    Since July 2013, White applicants have submitted 47.2 percent of all voter registration applications in Georgia.  White applicants, however, constitute only 13.6 percent of applicants who have been rejected as a result of the verification protocol during that period.  By contrast, 63.6 percent of rejected applicants are Black, even though Black applicants submitted 29.4 percent of all applications during that period.  Similarly, Latino applicants constitute 3.6 percent of total applicants and 7.9 percent of the rejected applicant pool during that period.

10.    Under the totality of the circumstances, including the historical, socioeconomic, and other electoral conditions that prevail in Georgia, the voter registration verification protocol denies Black, Latino, and Asian-American voters an equal opportunity to register to vote and participate in the political process.

---

[1] Georgia's data refer to suspended applicants as having a "pending" status and to most rejected applicants as having a "cancelled" status.

11.     Georgia's discriminatory and improper voter registration verification protocol, and its consequent cancellation of voter registration applications submitted by eligible voters, violates Section 2 of the Voting Rights Act of 1965 and the First and Fourteenth Amendments to the United States Constitution.  These constitutional and statutory violations, which are depriving tens of thousands of voters of the fundamental right to vote, justify the imposition of appropriate preliminary injunctive relief, as well as permanent declaratory and injunctive relief.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and (2) 28 U.S.C. § 1331, because this action arises under the laws of the United States.

13.     This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

15.    Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP

("Georgia NAACP") is a non-partisan, interracial, nonprofit membership

organization that was founded in 1941.  Its mission is to eliminate racial

discrimination through democratic processes and ensure the equal political,

educational, social, and economic rights of all persons, in particular African-

Americans.  It is headquartered in Atlanta and currently has approximately 10,000

members.  The Georgia NAACP works to protect voting rights through litigation,

advocacy, legislation, communication, and outreach, including work to promote

voter registration, voter education, get out the vote efforts, election protection, and

census participation.  The Georgia NAACP regularly conducts voter registration

drives and has submitted many voter registration applications to elections officials

throughout Georgia.  Upon information and belief, voter registration applications

filled out by eligible future Georgia NAACP members will be suspended and

rejected as a result of the voter registration verification protocol.  Additionally,

upon information and belief, minority applicants who attempted to register to vote

through registration drives conducted by the Georgia NAACP have had their

applications cancelled or suspended due to the verification protocol.  Georgia's

voter registration verification protocol is causing and will continue to cause the

Georgia NAACP to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or suspended. As a result, the Georgia NAACP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and GOTV efforts.

16.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members. The organization encourages voter registration and participation, particularly among minority and low-income citizens. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to conducting voter registration drives, voter education, voter ID assistance, Souls to the Polls, and other GOTV efforts in Georgia that seek to encourage turnout. Minority applicants who attempted to register to vote through registration drives conducted by GCPA have had their applications cancelled or suspended due to the verification protocol. Georgia's voter registration verification protocol is causing and will continue to cause harm

8

to the GCPA's mission of encouraging minority voter registration and participation. The protocol will cause GCPA to divert a portion of its financial and other organizational resources to educating voters about the protocol and assisting potential voters whose applications have been cancelled or suspended. As a result, the GCPA is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and GOTV efforts.

17. Plaintiff ASIAN AMERICANS ADVANCING JUSTICE – ATLANTA, INC. ("Advancing Justice") is a non-partisan, nonprofit organization that was founded in 2010. Located in Norcross, Georgia, the organization's mission includes protecting and promoting the civil rights of Asian immigrants and refugees and in Georgia through public policy, legal education, and civic engagement. *See* Advancing Justice's Mission Statement, *available at* https://advancingjustice-atlanta.org/page/8. Advancing Justice engages in voter registration, voter education, and get out the vote efforts in Georgia, with a particular focus on newly naturalized immigrant and refugee Asian-Americans. To further these efforts, the organization has developed various voter education materials and translated them into Chinese, Korean, and Vietnamese. One item, titled "COMPLETING A VOTER REGISTRATION APPLICATION," includes

9

guidance describing the applicant's responsibilities when filling out the prompt

asking for the driver's license number or the last four digits of his or her social

security number.  Upon information and belief, minority applicants who attempted

to register to vote through registration drives conducted by Advancing Justice have

had their applications cancelled or suspended due to the verification protocol.

Georgia's voter registration verification protocol is causing and will continue to

cause harm to Advancing Justice's mission to promote the rights of Asian

immigrants.  The protocol will cause Advancing Justice to divert a portion of its

financial and other organizational resources to educating voters about the protocol

and its impact on the registration process.  As a result, Advancing Justice is

limited, and will continue to be limited, to devoting fewer resources to its other

organizational activities, including voter registration drives and GOTV efforts.

18.    Defendant BRIAN KEMP is being sued in his official capacity as

Georgia Secretary of State.  Secretary Kemp's responsibilities include maintaining

the state's official list of registered voters and preparing and furnishing information

for citizens pertaining to voter registration and voting.  Ga. Code Ann. §§ 21-2-

50(a), 21-2-211.  Defendant also serves as the Chairperson of Georgia's State

Election Board, which promulgates and enforces rules and regulations to obtain

uniformity in the practices and proceedings of election officials and promotes the

fair, legal, and orderly conduct of all primaries and elections in the state.  *Id*. §§ 21-2-30(d), 21-2-31, 21-2-33.1.  Finally, Defendant is the chief election official responsible for the coordination of Georgia's list maintenance responsibilities under the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA).  *Id*. §§ 21-2-210, 21-2-50.2.

## FACTS AND BACKGROUND

### Voter Registration in Georgia under State and Federal Law

19.     A voter must be registered as an elector in Georgia to cast a ballot that counts in any election held in the state.  Ga. Code Ann. § 21-2-216(a)(1).

20.     Pursuant to HAVA, the State of Georgia is required to maintain a centralized, computerized statewide voter registration database as the single system for storing and managing Georgia's official list of registered voters.  52 U.S.C. § 21083(a)(1)(A).  All voter registration information obtained by local election officials in Georgia must be electronically entered into the database on an expedited basis at the time the information is provided to the local official.  *Id*.  The registration database must be coordinated with other agency databases within the state.  *Id*.

21.     HAVA also requires Georgia to undertake certain verification activities.  52 U.S.C. § 21083(a)(5).  Voter registration applicants who have been

issued a current and valid driver's license must provide their driver's license

number on the application.  52 U.S.C. § 21083(a)(5)(A).  Applicants who lack a

current driver's license must provide the last four digits of their social security

number.  *Id.*  If an applicant lacks both a current and valid driver's license and a

social security number, the state must assign the applicant a unique identifier for

voter registration purposes.  *Id.*

22.    HAVA requires that Georgia's chief election official enter into an

agreement with the Georgia Department of Driver Services (DDS) "to match

information in the database of the statewide voter registration system with

information in the database of the motor vehicle authority to the extent required to

enable each such official to verify the accuracy of the information provided on

applications for voter registration."  52 U.S.C. § 21083(a)(5)(B).  Further, DDS

must enter into an agreement with the Commissioner of Social Security for the

same purpose.  *Id.*

23.    HAVA does not mandate that voter registration applications be

cancelled if the information contained on the application fails to match fields in the

DDS or SSA databases.  *See* 52 U.S.C. § 21083; *Fla. State Conf. of the NAACP v.*

*Browning*, 522 F.3d 1153, 1171-72 (11th Cir. 2008); *Washington Ass'n of*

*Churches v. Reed*, 492 F. Supp. 2d 1264, 1268-69 (W.D. Wash. 2006); *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *7-8 (N.D. Ga. Oct. 27, 2008).

24.     All applicants who register by mail and have not previously voted in a federal election must provide proof of identification either with their registration application or when voting for the first time.  52 U.S.C. § 21083(b).  Satisfactory proof of identification (HAVA ID) includes a copy of a current utility bill, bank statement, government check, paycheck, other government document showing the name and address of the voter, or any current and valid photo identification.  52 U.S.C. § 21083(b)(2)(A).

25.     First-time voters can submit a copy of their HAVA ID along with their ballot if they choose to vote by mail.  52 U.S.C. § 21083(b)(2)(A)(ii).  If they choose to vote in person, first-time voters can present their current and valid photo identification or a copy of other HAVA ID to the election official or poll worker.  52 U.S.C. § 21083(b)(2)(A)(i).

26.     The Georgia Election Code requires the Secretary of State to "establish procedures to match an applicant's voter registration information to the information contained in the database maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided

satisfactory evidence of United States citizenship."  Ga. Code Ann. § 21-2-216(g)(7).  It does not specify that the "match" be an exact match or require the cancellation of applications that do not match the DDS database.

### The Georgia Voter Registration Verification Protocol

27.    The Georgia voter registration verification protocol was created in 2010 via administrative policy by Secretary of State Kemp pursuant to Ga. Code Ann. § 21-2-216(g)(7).  The matching protocol is not codified in any statute or regulation.

28.    The verification protocol relies upon an algorithm to compare information on a first-time applicant's voter registration form to information in the DDS or SSA databases, once the information from the form is entered into ENET.  If applicants provide their driver's license number on their registration form, the algorithm makes the comparison to information in the DDS database.  If applicants provide the last four digits of their social security number, the algorithm makes the comparison to information in the SSA HAVV database.

29.    The protocol requires that the information on an unregistered applicant's voter registration form exactly match corresponding fields in the applicant's record contained in the DDS or SSA databases.  If the information matches exactly, county election officials may continue to process the application.

14

30.     When the matching algorithm compares information between the applicant's voter registration application and the DDS database, it compares the following fields: first name, last name, date of birth, driver's license or state ID number, Social Security number (if the applicant provided it), and citizenship status.  *Registration Basics*, Georgia Registrar Official Certification Registrar Course No. 4, page 50.

31.     When the matching algorithm compares information between the applicant's voter registration application and the SSA database, it compares the following fields: first name, last name, date of birth, and last four digits of the social security number.  SSA is also required to report whether its records indicate that the registrant is deceased.  "Help America Vote Verification (HAVV) Fact Sheet and Usage by State," Social Security Administration, *available at* https://www.ssa.gov/open/havv/#representation.

32.     In the event the data in one of the fields of the DDS or SSA databases does not match exactly with the information provided on the voter registration application, the ENET system sends a report to the local registrar.  The report identifies whether the information in the application failed to match with information in the DDS or the SSA database.

33.     If applicants provide a driver's license or state ID number on their voter registration application, and information in one of the data fields fails to match the information in the DDS database, the report produced by ENET identifies the exact fields that failed to match.

34.     If applicants provide the last four digits of their social security number on their voter registration application, and information in one of the data fields fails to match the information in the SSA database, the report produced by ENET does not provide any details to the local registrar about which fields failed to match.  The report to the local registrar only returns a code "Z," which indicates that the information from any or all of the data fields did not match to one or more records in the SSA database.

35.     Under Georgia's voter registration verification protocol, local election officials may compare the information on the voter registration application with the information entered into ENET, in the event a mismatch is reported.  They are not, however, required to undertake any such comparison.

36.     County election officials from all 159 Georgia counties enter data into ENET, and clerical errors sometimes occur at the county level.

37.     In a document submitted for preclearance under Section 5 of the Voting Rights Act describing the voter registration verification protocol, the state

indicated that "the board of registrars should check the application to determine whether there are processing or data entry errors, such as transposing of numbers, misspelling of applicant's name, use of a nickname or other typographical or 'common sense' errors that the registrar is able to easily identify and correct." Exhibit 1, "Process for Entering New Voter Registration Application Information into the Statewide Voter Registration System" at 4, State of Georgia Submission Under Section 5 of the Voting Rights Act (Aug. 17, 2010).

38.     The verification protocol, as described in the preclearance submission, provides that "[i]f the board of registrars locates such a processing or data entry error, the entry should be corrected and marked so that it can be run through the verification process again on the next evening." *Id*.

39.     The Georgia voter registration protocol, as described in the Section 5 preclearance submission, does not provide for any oversight of the correction process or procedures to ensure that local election officials are checking for processing or data entry errors.

40.     Since the SSA mismatch notification to the county registrars contains no indication of what data fields on the application failed to match the SSA database, election officials cannot identify whether the mismatch was caused by a data entry or other clerical error.

17

41.    The protocol requires that election officials consider a voter registration application "incomplete" pursuant to Ga. Code Ann. § 21-2-220(d) if any information does not match exactly with all of the corresponding data fields in the DDS or SSA databases.   Therefore, under this protocol, complete applications submitted with accurate identifying information by eligible voters are routinely marked incomplete and the applicants are not added to the voter registration list.  The result is disenfranchisement.

42.    Voter registration applications are considered "incomplete" if the information matches with all but one digit or character in one field in the DDS database.  For example, an application is considered incomplete if the applicant's last name, social security number, driver's license number, date of birth and citizenship status all match information held by DDS, but their first name does not match exactly.  Similarly, an application is considered incomplete if the applicant's last name, first name, social security number, date of birth and citizenship status match, but the driver's license number does not match exactly because two digits are transposed.

43.    The voter registration verification protocol mandates that if an application is considered incomplete, the applicant's registration status must be changed to "pending" in ENET.

18

44.     The voter registration verification protocol requires that, in the event of a mismatch, county election officials send a notification letter to voters placed into pending status.  Notification letters are issued by the local election official, using a template created by the Secretary of State's office.

45.     The current notification letters inform voter registration applicants that they must respond to the letter by a date certain, which is specified in the letter.  That date is apparently predicated on a "forty day clock" that begins running when the letter is issued by the ENET system, as opposed to the date the letter is physically mailed to the applicant.

46.     The "forty day clock" automatically cancels the application if the verification issue is not resolved within forty days of the date the notification letter was issued by ENET.  Copies of examples of the notification letters issued to voter registration applicants who fail the match with the DDS or SSA databases are attached and incorporated by reference as Exhibit 2.

47.     Pursuant to the voter registration protocol, a "pending" voter registration application is automatically cancelled forty days after the issuance of the notification letter, if the failure to match is not resolved prior to that time.

48.     Registrars are instructed not to determine the eligibility of applicants placed into pending status unless they respond to the notification letter or contact an election official and provide additional information.

49.     The notification letter includes one exception to the general requirement that voters who fail the matching process must resolve the mismatch to be able to vote.  It provides that voters who "have received this notice within 30 days of an election or primary [] may still be able to vote by providing proper identification at the time you request a ballot."  *Id.*

50.     The voter's pending registration application is automatically cancelled pursuant to the protocol forty days after the issuance of the notification letter, if the failure to match is not resolved prior to that time.

51.     However, if (1) an applicant applies to register to vote before the voter registration deadline, (2) his or her application information was not verified, and (3) the application has not yet been rejected by the "forty day clock" as of election day, the applicant's registration information will appear in ENET with codes indicating, "Pending DDS," "Pending SSN," or "Pending Citizenship."  Applicants in this situation will be allowed to complete the registration process by showing appropriate identification or proof of citizenship when they request a ballot.  Applicants can cast a provisional ballot if their application is in pending status and they have not supplied

the necessary information prior to attempting to vote. The applicant's provisional ballot will count if he or she provides proper identification or proof of citizenship to the registrar. *Registration Basics*, Georgia Registrar Official Certification Registrar Course No. 4, page 57.

52. The voter registration verification protocol burdens voter registration applicants who fail the matching process by requiring them to present proof of identity before voting.

53. The ENET system may not permit the local registrar to override the system to move a voter registration applicant from the pending list to the voter roll as a registered voter even in the event that a voter responds to the notification letter and presents proof of identity.

54. If a data entry or other clerical error is located in a record contained in the DDS or SSA database, resolving the applicant's registration status will be extremely challenging. Some voter registration applicants may never learn of the error in the DDS or SSA database. Applicants who do learn about the error face the burden of contacting DDS or SSA officials and getting the problem corrected, then contacting election officials a second time to have the application processed again.

55. The Georgia voter registration verification protocol allows applicants who receive the notification letter within 30 days of an election to vote if they present

21

identification at the polls, but denies that same opportunity to applicants who fail the same matching process and receive the letter more than thirty days before the election.

## SSA Notification Letters

56.    Notification letters sent to applicants whose information fails to match with the SSA database (SSA notification letters) provide that their "information did not match the records at SSA." *See* Exhibit 2.  The letter does not include any details concerning what information on their registration application or what fields in the SSA database failed to match.

57.    SSA notification letters do not inform applicants that the mismatch could be the result of a mistake they made in filling out the application, a clerical error by an election official, or the result of a change in the way the applicant spells their name, such as the decision to use or not use a hyphen between two last names.

58.    Since SSA notification letters do not identify the source of the mismatch or provide additional information about the potential sources of the error, they place the burden entirely on applicants to determine how to cure the discrepancy.  It is not clear how voter applicants could even begin this process without more information or guidance from the State.

**Comparing Information with the SSA Database Yields Particularly
Inaccurate Results**

59.    In 2009, the Social Security Administration Office of the Inspector
General produced a report assessing the accuracy of its matching program—the
program relied upon by the Georgia voter registration verification protocol—
comparing state voter registration application information with the SSA database.
SSA calls this matching program the "Help America Vote Verification program"
(HAVV).  Exhibit 3, "Quick Evaluation Response: Accuracy of the Help America
Vote Verification Program Responses (A-03-09-29115)," Office of the Inspector
General, Social Security Administration, June 22, 2009.

60.     The Inspector General report concluded that the HAVV program "did
not always provide States with accurate verification responses for individuals who
were registering to vote."  *Id*. at 4.

61.    The report indicated that the HAVV program's "no-match response
rate was 31 percent, while the no-match response rate for other verification
programs used by States and employers ranged from 6 to 15 percent."  *Id*.

62.    The report also found apparent anomalies in the HAVV program,
which would result in responses "initially indicat[ing] a match response"
subsequently being changed to "a no-match response when the same data (name,

23

SSN, DoB, and last four digits of the SSN) were entered into the verification program." *Id*.

63.     The report concluded that "the high no-match response rate and the inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote." *Id*.  In fact, it found that "the HAVV program may indicate a no-match when a match does in fact exist in SSA records" due to "the limitations of the matching criteria." *Id*.

64.     The report determined that "the high no-match response rate and the inconsistent verification responses can be attributed to the lack of (1) a unique identifier (full SSN), (2) flexible matching criteria, and (3) testing to assess the accuracy of the verification responses." *Id*.  For example, "the HAVV program does not allow flexibility with matching the name and DoB to its records to compensate for typographical errors, other common database errors, and mistakes…" *Id*.

**Individual Voters Ensnared by the Voter Registration Verification Protocol**

65.     The Kafkaesque nature of Georgia's voter registration verification protocol is best demonstrated through the experiences of eligible voters who have been disenfranchised by it.

66.     Amos Boadai, a Ghanaian immigrant who currently serves in the United States Army and became a naturalized citizen in May 2011, moved from Virginia to Georgia in 2013.  Mr. Boadai had successfully registered and voted in Virginia prior to moving to Georgia.  There are no discrepancies in his name or date of birth between his naturalization certificate, Georgia driver's license, and Social Security card.

67.     Mr. Boadai filled out a voter registration application on May 19, 2014, which was processed by Muscogee County election officials on September 8, 2014.

68.     On September 10, 2014, a record was returned to a Muscogee County election official via ENET that the information failed to match with a corresponding field in the SSA database.  The record does not state what data field or fields failed to match the database.

69.     The voter file indicates that ENET produced two letters to Mr. Boadai dated September 10, 2014.  Mr. Boadai has indicated that he did not receive either letter from the county.  The voter file confirms that the election official failed to enter the apartment number that Mr. Boadai supplied on his application when inputting his data into ENET.

70.     On September 11, 2014, after the letters were apparently issued, a local election official modified Mr. Boadai's record to add his apartment number. There is no evidence in the voter file that the official reissued either of the two letters to Mr. Boadai at his correct address.

71.     On October 20, 2014, after the close of registration for the November 2014 election, Mr. Boadai's voter registration application was automatically cancelled in ENET.

72.     Mr. Boadai still does not know why his application was rejected.

73.     Mr. Boadai recently moved back to Virginia in 2016 and has applied to vote there.

74.     Elton Garcia-Castillo is a citizen who attempted to register to vote in Hall County for the first time in 2014.

75.     In August 2014, Mr. Garcia-Castillo received a letter informing him that his "information did not match the records at SSA."  The letter provided that he "may correct the information by clearly printing the requested information" and returning it to the Hall County elections office "not later than Sep 24, 2014."  It concluded that "[f]ailure to provide the required information will result in a delay or rejection of your application."  Exhibit 4, Letter to Elton Garcia-Castillo.

26

76.     Mr. Garcia-Castillo did not understand that his application would be cancelled if he failed to respond to the letter within 30 days and thought he would be able to clear up any issues when he went to vote.

77.     In 2015, Mr. Garcia-Castillo attempted to vote in the Gainesville municipal election on Election Day.

78.     Poll workers informed him that he was not eligible to vote because he was not on the registration list.  He was also informed by the Hall County elections office that his application failed the Georgia voter registration verification protocol and was cancelled when he failed to respond to the notification letter.  Mr. Garcia-Castillo was disenfranchised in the 2015 Gainesville municipal election.

79.     Later that same day, he completed a second voter registration application at the Hall County elections office.  Mr. Garcia-Castillo's second voter registration application was successfully processed and he was added to the voter registration list.

80.     Mr. Garcia-Castillo still does not know why his initial application was rejected.

**The Voter Registration Verification Protocol Disproportionately Burdens Minority Voters**

81.     Georgia's voter registration verification protocol creates an additional requirement for the qualification of voter registration applicants that was not

27

provided for by the General Assembly.

82.     When compared to the overall voter registration applicant pool, applications submitted by minority voters are disproportionately placed into pending status because information fails to match with corresponding data fields from the DDS or SSA databases.

83.     When compared to the overall voter registration applicant pool, applications submitted by minority voters are disproportionately cancelled.

84.     A disproportionate number of Black, Latino, and Asian-American voter registration applicants remain in cancelled status due to the Georgia voter registration verification protocol, when compared with the number of White voter registration applicants.

85.     The cancellation rate for voter registration applicants due to the Georgia voter registration verification protocol has a significant and racially disparate impact on members of a protected racial or language minority group.

86.     According to data provided by the Secretary of State, the cancellation rates for applicants who identified as Black from July 2013 through July 2016 was far higher than the cancellation or rejection rates for White applicants.

87.     Of voter registration applicants who successfully registered or changed their information between July 2013 and May 2016, approximately 48.3

percent identify as White, 28.2 percent identify as Black, 3.7 percent identify as Hispanic, and 2.6 percent identify as Asian-American.[2]

88.    By comparison, of the approximately 34,874 voter registration applicants whose applications were cancelled between July 7, 2013 and July 15, 2016, and whose ENET record contains a "Status Reason" of "Not Verified," approximately 63.6 percent identify as Black, 7.9 percent identify as Latino, 4.8 percent identify as Asian-American, and 13.6 percent identify as White.[3]

89.    Of the approximately 34,874 applicants whose registration applications were cancelled, approximately 8,267 include a "Reason Code" of "DDS," while 21,844 are coded "SSN."

90.    Of the 8,267 applicants coded "Not Verified" and "DDS," approximately 1,592 (19.3%) identify as White, 4,228 (51.1%) identify as Black, 1,167 (14.1%) identify as Latino, and 640 (7.7%) identify as Asian-American.

---

[2] Statistical data relating to the registration status of Georgia voters in this complaint are based on active, pending, and cancelled voter lists previously provided by the Secretary of State's office.  Plaintiffs reserve the right to amend or modify these data as discovery develops in this case.

[3] The statistics in this paragraph, and in the ones that follow, do not include cancelled or pending applicants with a status reason of "Incomplete Address," "Incomplete DOB," "Incomplete Name," "Error," "Duplicate," "Non-Citizen," "Voter Requested," or any other status reason other than those specifically identified herein.

91.    Of the 21,844 applicants coded "Not Verified" and "SSN," approximately 2,160 (9.9%) identify as White, 16,067 (73.6%) identify as Black, 1,005 (4.6%) identify as Latino, and 380 (1.7%) identify as Asian-American.

92.    Of the 1,299 applicants coded "Not Verified" and "CIZ," approximately 181 (13.9%) identify as White, 395 (30.4%) identify as Black, 275 (21.2%) identify as Latino, and 326 (25.1%) identify as Asian-American.

93.    Voter registration applications submitted by Black, Latino, and Asian-American individuals were disproportionately cancelled or rejected due to the implementation of the Georgia voter registration verification protocol between July 7, 2013 and July 15, 2016.

94.    As of July 15, 2016, the voter registration status of 7,696 applicants was listed as "Pending," with a status reason of "DDS Verification," "SSN Verification," or "Citizenship Verification."

95.    More than 2,000 of the 7,696 applicants in pending status were listed as having a status reason of "DDS Verification."  Of those more than 2,000 applicants, approximately fifteen percent identify as White, 61 percent identify as Black, ten percent identify as Latino, and between six and seven percent identify as Asian-American.

96.    More than 4,000 of the 7,696 applicants in pending status were listed as having a status reason of "SSN Verification."  Of those more than 4,000 applicants, approximately eight percent identify as White, between 79 and 80 percent identify as Black, four percent identify as Latino, and one percent identify as Asian-American.

97.    Of the 207 applicants in pending status with a status reason of "Verification," approximately 11.1 percent identify as White, 79.2 percent identify as Black, 1.4 percent identify as Latino, and 1.9 percent identify as Asian-American.

98.    Of the 609 applicants in pending status with a status reason of "Citizenship Verification," approximately 11.3 percent identify as White, 41.1 percent identify as Black, 19.4 percent identify as Latino, and 18.7 percent identify as Asian-American.

99.    Approximately 7.8 percent of voter registration applications submitted by individuals identifying as Black have been placed in cancelled or pending status due to a failure to exactly match DDS or SSA data.  This is eight times the rate for White applicants (0.9%).  The corresponding rate for Latino applicants (6.1%) is more than six times the rate for White applicants.

100.   Asian-American applicants are 6.7 times more likely not to be verified than White applicants.  Latino and Black applicants are both more than seven times more likely to have their registration applications not verified than White applicants.

101.   The cancellation rate for minority voter registration applicants was far higher than the cancellation rate for White applicants in 2014 due to the voter registration verification protocol.

**The Disproportionate Impact is Caused by and Linked to Social and Historical Conditions Producing Discrimination against Minority Applicants**

102.   Georgia's voter registration verification protocol works in concert with historical, socioeconomic, and other electoral conditions in Georgia to deny Black, Latino, or Asian-American voters an equal opportunity to register to vote and participate in the political process, in violation of Section 2 of the Voting Rights Act.

103.   Disparities in socioeconomic status and voter participation are the result of Georgia's unfortunate history of pervasive racial discrimination in areas such as education.  For example, de jure segregation continued well after *Brown v. Board of Education* was decided.  More than 80 Georgia counties were required to desegregate following a 1969 school segregation case.  *See United States v. Georgia*, C.A. No. 12972 (N.D. Ga. 1969); *United States v. Georgia*, 466 F.2d 197

(5th Cir. 1972); "Desegregation of Public School Districts in Georgia," Georgia Advisory Committee to the United States Commission on Civil Rights 21 (Dec. 2007), *available at* http://www.usccr.gov/pubs/GADESG-FULL.pdf.

104.   Due to social and economic conditions caused by historical and ongoing discrimination, including poverty, unemployment, lower educational attainment, and lack of access to transportation, minority voters are disproportionately burdened by the Georgia voter registration verification protocol.

105.   There is a history of state-based and other discrimination in Georgia that has resulted in a disparity in driver's license and Georgia ID ownership rates between White and Black voters.  During the pendency of the Georgia photo ID litigation, the Secretary of State's office issued a press release reporting that a database match between the State's file of registered voters and the DDS data file of persons issued valid Georgia driver's licenses or Georgia ID cards revealed that 676,246 registered voters either had no record of a driver's license or ID issued, or had their licenses revoked, suspended, cancelled, denied, or surrendered.  *Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1311 (N.D. Ga. 2006).  While 27.8 percent of the voters on the registration list were Black, 35.6 percent of voters who lacked a driver's license or Georgia ID card were Black.  *Id*.

106.   Black voter registration applicants are less likely than White applicants to own a Georgia driver's license or state ID card, and therefore are more likely to have to provide the last four digits of their social security number. The result is that Black voter registration applicants are more likely to be verified through a match with the SSA database, whereas White applicants are more likely to be verified through a match with the DDS database.

107.   Voter registration applications matched with information from the DDS database are more likely to be verified successfully and processed than applications matched with information from the SSA database.

108.   Georgia's voter registration verification protocol occurs in the context of significant racial disparities in voter participation and socioeconomic status that are the legacy of Georgia's history of racial discrimination.

109.   Black, Latino, and Asian-American voters in Georgia continue to bear the effects of discrimination, which hinder their ability to participate effectively in the political process.  As a result of the history of official and private discrimination in Georgia, Black and Latino residents lag far behind White residents in a wide range of socioeconomic indicators, including income, poverty status, educational attainment, and access to health care.  Asian-American residents also trail White residents on certain measures of socioeconomic status.

34

110.   The 2010 Census indicates that Georgia has a total population of 9,687,653; of whom 2,910,800 (30.0%) are Black; 853,689 (8.8%) are Latino; 311,692 (3.2%) are Asian-American; and 5,413,920 (55.9%) are White.

111.   According to the 2014 American Community Survey five-year estimate ("ACS"), there are significant racial disparities in income levels.  The median income in Black households in Georgia is $36,356; in Latino households it is $38,082; and in White households it is $57,820.  U.S. Census Bureau, 2010-14 American Community Survey 5-Year Estimates, Tables B19013B, B19013D, B19013H, and B19013I.

112.   The 2014 ACS also indicates that 27.0 percent of Georgia's Black residents live in poverty, while the poverty rate is 31.2 percent among Latino residents, 13.5 percent among Asian-American residents, and 12.0 percent among White residents.  U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates, Tables B17001B, B17001D, B17001H, B17001I.

113.   Similarly, 26.8 percent of Black households, 21.2 percent of Latino households, and 9.2 percent of White households in Georgia received food stamps or SNAP benefits in the past 12 months.  U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates, Tables B22005B, B22005D, B22005H, B22005I.

114.   There are racial disparities in language proficiency rates in Georgia.

For example, ACS data indicates that 59.1 percent of Latino and 41.2 percent of

Asian-American voting age residents in Georgia are limited English proficient,

which is traditionally defined as speaking English less than "very well."  That rate

is 1.0 percent for non-Hispanic White voting age residents.  Meanwhile, 41.2

percent of Latino and 18.8 percent of Asian-American voting age residents in

Georgia speak English "not well" or "not at all," compared to 0.4 percent of non-

Hispanic White voting age residents.

115.   Racial disparities also exist in education levels.  For example, the

2014 ACS indicates that 16.3 percent of Black residents, 41.8 percent of Latino

residents, 14.0 percent of Asian-American residents, and 11.3 percent of White

residents in Georgia did not graduate from high school.  By contrast, 20.8 percent

of Black residents, 14.2 percent of Latino residents, and 32.1 percent of white

residents graduated from college.  U.S. Census Bureau, 2010-2014 American

Community Survey 5-Year Estimates, Tables C15002B, C15002D, C15002H,

C15002I.

116.   ACS data indicates there are racial disparities in home ownership

rates.  That rate is 48.1 percent in Georgia among Black households, 43.7 percent

among Latino households, and 63.0 percent among Asian-American

households.  In White households, that rate is 74.4 percent.  U.S. Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Tables B25003B, B25003D, B25003H, B25003I.

117.   There is also a racial disparity in vehicle ownership rates.  The percentage of households without a vehicle is 13.3 percent in Georgia among Black households, 8.7 percent among Latino households, and 4.5 percent among Asian-American households.  In White households, that rate is 3.5 percent.  U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Table DP04.

118.   There are significant racial disparities in voter participation as well. Georgia's Black, Latino, and Asian-American voters have lower rates of voter registration and turnout compared to their White counterparts.

119.   Voter turnout, as reported by the Georgia Secretary of State's office, demonstrates that White voter participation in competitive statewide, county, and municipal contests in Georgia exceeds Black voter participation.  The White turnout rate in statewide elections was 16.9 (2016 presidential primary), 7.1 (2014 general), and 3.1 (2012 general) percentage points greater than the Black turnout rate.  The White turnout rate was 22.7 (2016 presidential primary), 27.0 (2014 general), and 19.2 (2012 general) percentage points greater than the Latino turnout

rate in recent statewide elections, and the White turnout rate was 29.6 (2016 presidential primary), 26.2 (2014 general), and 20.9 (2012 general) percentage points greater than the Asian-American turnout rate in recent statewide elections. *Voter Turn Out by Demographics*, GA. SEC'Y OF STATE, http://sos.ga.gov/index.php/Elections/voter_turn_out_by_demographics (last visited Aug. 28, 2016).

120.   The Georgia voter registration verification protocol turns the act of filling out a voter registration application into a functional test.  The protocol imposes an additional requirement on applicants who make a minor mistake by requiring them to contact election officials and provide updated information to complete their application.  These insubstantial errors will lead to a mismatch under the current protocol, requiring voters to "update" their information without clear guidance or identification of the initial error.

121.   Data show that the most popular given names vary regionally, culturally and along lines of race.  Because minority voters are more likely to have unique and non-traditional names, they are more likely to be impacted by data entry efforts made on the part of local and state officials.

122.   The rate at which applicants have been placed in cancelled or pending status between July 2013 and July 2016 due to failing the first or last name match

38

varies significantly by race.  This is true even when considering the presence of special characters in applicants' names (spaces, hyphens, and apostrophes).

123.   For example, White applicants whose names contain special characters both fail the name match and remain in cancelled or pending status at a rate of 1.7 percent.   The corresponding rate for similarly situated Black applicants is 3.9 percent.  That rate is 4.4 percent for Latinos and 12.9 percent for Asian-Americans.

124.   Data entry errors by DDS would also cause a facially complete and entirely accurate application to fail the Georgia voter registration verification protocol.

125.   Eligible voter registration applicants with lower levels of educational attainment, a lower level of proficiency in English, or less familiarity with bureaucratic procedures are more likely to make minor, insubstantial mistakes when completing their voter registration applications or driver's license/Georgia ID applications than other voters.

126.   The same socioeconomic factors that cause Black, Latino, and Asian-American voters to have lower voter registration rates make it more difficult for these voters to navigate the bureaucratic process after they have been placed into pending status and are sent a notification letter.

127.   Notification letters are only sent to voter registration applicants in English.  Applicants who are limited in their English proficiency have more difficulty understanding the notification letter.  They also face additional challenges when communicating with election officials and completing other tasks required to remedy the problem with their registration status.

128.   Minority voters are more likely than White voters to be working multiple jobs, have an inflexible schedule, maintain irregular work hours, lack access to transportation, or suffer from financial hardship or economic displacement.  It is more difficult for these voters to follow up with election officials in a timely manner than those who have access to transportation, can afford to take time off from work, and have a flexible schedule.

**History of Discrimination Affecting the Right to Vote in Georgia**

129.   There is a long—and well documented—history of voting-related discrimination against Blacks in Georgia.  Indeed, the Northern District of Georgia has recently acknowledged "Georgia's long history of discrimination" in this area. *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (*citing Brooks v. State Bd. of Elections,* 848 F. Supp. 1548, 1560-61, 1571 (S.D. Ga. 1994) (stating that Georgia's "segregation practice and laws at all levels has been rehashed so many times that

the Court can all but take judicial notice thereof")), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

130.   The origins of the voter registration verification protocol are part and parcel of that history of discrimination.

131.   The Georgia Secretary of State's office began implementing a predecessor version of the current voter registration verification protocol shortly before the 2008 presidential election without first obtaining preclearance.  The U.S. District Court for the Northern District of Georgia held that doing so violated Section 5 of the Voting Rights Act.  *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008).

132.   The U.S. Department of Justice objected to Georgia's submission of the 2008 voter registration verification protocol for preclearance.  It concluded that the initial version of the program relied on error-laden and "possibly improper" usage of the Social Security Administration's HAVV system and outdated Georgia Department of Driver Services data in an attempt to find non-citizens.  Letter from Loretta King, Acting Ass't Att'y Gen., Dep't of Justice, to Ga. Att'y Gen. Thurbert

E. Baker, May 29, 2009, *available at* http://www.justice.gov/crt/voting-determination-letters-georgia.  It caused thousands of legitimately naturalized citizens (as well as many natural-born citizens) to be incorrectly flagged as ineligible non-citizens.

133.   The letter concluded that the "flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote." *Id*. at 4.

134.   The Georgia Secretary of State's office subsequently modified some aspects of the program, and submitted a new version for preclearance.  The Department of Justice precleared the revised voter registration verification protocol in 2010.  The standard of review used under Section 5 is different than the standard under Section 2.  Under Section 5, a jurisdiction must show that its voting change was neither adopted with a discriminatory purpose nor would have a discriminatory effect.  52 U.S.C. § 10304(a).  The "effect" standard prohibits backsliding, i.e., it bars any change "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).  Preclearing a voting change does not preclude a subsequent action under Section 2 or suggest that the

42

voting change does not have a discriminatory result under Section 2's objective standards.  *Id*. § 10304(a) ("Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.").

135.   Since implementing the protocol, the Georgia Secretary of State's office has been made aware repeatedly by minority community members, the Department of Justice, and others of concerns that its voter registration verification protocol, in practice, disproportionately burdens eligible minority applicants.  It has nonetheless failed to respond by ameliorating or making changes to aspects of the program that predictably impose disproportionate burdens on minority voters, such as the exact match requirement.

136.   Voting-related discrimination against Black, Latino, and Asian-American citizens in Georgia continues today.

137.   The Georgia Senate recently passed Senate Resolution 675 (2016) (SR 675), which sought to amend the Georgia Constitution to make English the state's official language and prohibit the use of any language other than English in any Georgia state or local government document, proceeding, or publication.  SR

675 would have prohibited the dissemination of ballots and other election-related documents in any language other than English.  More than 200 ethnic business groups, churches, and other organizations condemned or lobbied against SR 675.  The House did not pass SR 675 prior to the end of the legislative session.  Jeremy Redmon, *Georgia House panel blocks English-only amendment to constitution*, THE ATLANTA JOURNAL-CONSTITUTION, Mar. 10, 2016, *available at* http://www.ajc.com/news/news/local/nuestra-comunidad-hispanic-and-asian-communities-u/nqr64/; "Asian Americans Advancing Justice Atlanta Media Alert," *Press Conference – Ethnic Chambers of Commerce Oppose Anti-Immigrant Bills*, *available at* Mar. 9, 2016, http://us2.campaign-archive2.com/?u=c07af679cb8d889c8f33cb996&id=e13213b1a0.

138.   Voting-related discrimination against Blacks in Georgia is not merely a relic of long-ago history.  The more recent history of voting discrimination against minority voters in Georgia between 1982 and 2006 is further detailed in various reports produced during the 2006 reauthorization of the Voting Rights Act.  *See* Am. Civil Liberties Union, *The Case for Extending and Amending the Voting Rights Act* 108-479, *available at* https://www.aclu.org/files/pdfs/votingrightsreport20060307.pdf; RenewtheVRA.org, *Voting Rights in Georgia 1982-2000*, *available at*

44

http://www.protectcivilrights.org/pdf/voting/GeorgiaVRA.pdf.  Additional

evidence of voting discrimination can be found in various academic articles and

books.  *See*, *e.g.*, Laughlin McDonald et al., *Georgia*, *in* QUIET REVOLUTION IN THE

SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 67-102 (Chandler

Davidson & Bernard Grofman eds., 1994).

139.  In 2005, Georgia adopted a photo identification requirement (2005

photo ID law).  The 2005 photo ID law required individuals lacking photo ID to pay

$20 for a photo ID card or to sign an affidavit declaring indigency.  *Common

Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1367-69 (N.D. Ga. 2005).  In a case

challenging that requirement, the U.S. District Court for the Northern District of

Georgia granted plaintiffs' motion for a preliminary injunction.  *Id*. at 1376.  The

court held that plaintiffs established a likelihood of success on the merits of their

claims that the 2005 photo ID law imposed a poll tax in violation of the Twenty-

fourth Amendment and unduly burdened the fundamental right to vote in violation

of the Equal Protection Clause of the Fourteenth Amendment.  *Id*. at 1370.  In

response to the court's opinion, the Georgia Legislature revised the photo ID law in

2006.  *See Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009) (upholding

the revised 2006 photo ID law).

140.   There is also a history of hostility by the Georgia Secretary of State's office toward third-party voter registration activity.

141.   Minority-affiliated organizations are responsible for a substantial portion of the third-party voter registration activity in Georgia.

142.   In *Charles H. Wesley Education Foundation v. Cox*, 408 F.3d 1349 (11th Cir. 2005), a charitable and educational organization affiliated with the predominantly African–American Alpha Phi Alpha fraternity and a voter filed suit against former Georgia Secretary of State Cathy Cox.  Her office refused to accept 64 completed voter registration applications submitted by the organization, which had conducted a voter registration drive in DeKalb County, Georgia.  *Id*. at 1351. The Eleventh Circuit upheld the District Court's order granting plaintiffs' motion for a preliminary injunction, concluding that the plaintiffs had established a substantial likelihood of success on the merits of their claim that refusing to accept applications submitted by third party registration drives violated the NVRA.  *Id*. at 1354.

143.   In 2010, the Georgia Secretary of State's office aggressively pursued an investigation of a dozen Black voting organizers in Brooks County that led to a criminal prosecution.  Ariel Hart, *Voting case mirrors national struggle*, THE ATLANTA JOURNAL-CONSTITUTION, Dec. 13, 2014, *available at*

http://www.myajc.com/news/news/state-regional-govt-politics/voting-case-mirrors-national-struggle/njRG6/.   The investigation followed the election of the county's first-ever majority-black school board, which was catalyzed by the get-out-the-vote activists.   None of the organizers were convicted, even though they were initially charged with more than 100 election law violations and more than 1,000 combined years in prison.   *Id*.   The Georgia Attorney General subsequently issued an opinion saying that the organizers' alleged crime, mailing absentee ballots by a third party, is permissible under state law.   Cristina M. Correia, Esq., Ass't Att'y General, Official Opinion 2016-2, June 15, 2016, *available at* http://law.ga.gov/opinion/2016-2.

### Other Factors Relevant to the Totality of Circumstances in Georgia

144.   There is a majority vote requirement in all elections in Georgia, which makes it more difficult for Black, Latino, and Asian-American voters to elect candidates of choice because they comprise a minority of the electorate.

145.   Voting patterns in Georgia are racially polarized.   Courts have repeatedly held that racially polarized voting exists at the statewide, county, and local levels.   *See*, *e.g.*, *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 88 (D.D.C. 2002), *rev'd on other grounds*, 539 U.S. 461  (2003); *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D.

47

Ga. 2013), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *Hall v. Holder*, 955 F.2d 1563, 1571 (11th Cir. 1992), *vacated and remanded on other grounds*, 512 U.S. 874 (1994); Robert A. Kengle, *Voting Rights in Georgia: 1982-2006*, 17 S. CAL. REV. L. & SOC. JUST. 367, 397, 404 (2008).

146.   Blacks, Latinos, and Asian-Americans have not been elected to public office in Georgia at a rate that is commensurate with their share of the population. All of the current statewide elected officials are White, and minorities are underrepresented in the Georgia House of Representatives and Senate, as well as in the state's congressional delegation.

147.   Voter fraud is extremely rare in Georgia.

148.   The Georgia voter registration verification protocol is tenuously related to the goal of preventing voter fraud.

**COUNT ONE:**
**VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965**

149.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 148 above, as if fully set forth herein.

150.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group.  Section 2 provides, in relevant part:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

151.   The Georgia voter registration verification protocol constitutes a qualification or prerequisite to voting within the meaning of Section 2 of the Voting Rights Act, and results in the denial or abridgement of the right to vote of Georgia citizens on account of their race or color in violation of Section 2.

152.   It imposes a substantial, unwarranted, and disproportionate burden on Black, Latino, or Asian-American applicants and denies them equal opportunity to register and to vote in Georgia elections.

153.   The Georgia voter registration verification protocol interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent Black, Latino, and Asian-American applicants from have an equal opportunity to register and vote.  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

49

154.   In Georgia, the following circumstances are present: (1) a history of discrimination related to voting; (2) racially polarized voting patterns; (3) members of the minority group bear the effects of discrimination in such areas as education, employment, and health; (4) members of the minority group are underrepresented among Georgia's elected officials; (5) a lack of responsiveness to the needs of the minority community; and (6) the arbitrary policy underlying the Georgia voter registration verification program is tenuously related to its stated purpose, which is to "assure the identity and eligibility of voters and to prevent fraudulent or erroneous registrations."  Exhibit 1, "Process for Entering New Voter Registration Application Information into the Statewide Voter Registration System" at 3, State of Georgia Submission Under Section 5 of the Voting Rights Act (Aug. 17, 2010).

155.   As a result of the Georgia voter registration verification protocol, and under the totality of the circumstances, the political process in Georgia is not equally open to participation by Black, Latino, or Asian-American citizens insofar as they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

156.   Plaintiffs therefore seek a declaratory judgment that the Secretary of State's maintenance and application of the voter registration verification protocol violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

157.   Further, Plaintiffs are without an adequate remedy at law.  Unless the Court enjoins the Secretary of State from maintaining and applying his unlawful voter registration verification protocol, Plaintiffs will continue to suffer the immediate and irreparable harm described herein.

**COUNT TWO:**
**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**

158.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 157 above, as if fully set forth herein.

159.   The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right.  The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (Virginia's poll tax violates the Equal Protection Clause); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983) (the right to vote is incorporated into the Due Process Clause).

160.   By preventing applicants from registering to vote until certain application information matches in minute detail with corresponding fields in the

DDS or SSA databases, the Georgia voter registration verification protocol imposes a severe burden on the fundamental right to vote of Georgia citizens by depriving tens of thousands of applicants of that right altogether. The verification protocol is not narrowly drawn to advance any state interest sufficiently compelling to justify the imposition of such severe burdens.

161.   While the burdens of this protocol are undeniably severe, the protocol cannot pass muster even under the less restrictive *Anderson-Burdick* balancing test for more ordinary voting regulations. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that courts "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs rights'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))).

162.   There is no sufficient state interest justifying the protocol that was not already adequately protected by preexisting criminal laws and election procedures.

163.   The Georgia voter registration verification protocol imposes severe burdens on citizens' right to vote, requiring Plaintiff organizations to divert resources in an attempt to remedy the deprivation.

164.   Plaintiffs therefore seek a declaratory judgment that, through maintenance and application of this protocol, the Secretary of State, acting under color of state law, is depriving Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

165.   Further, Plaintiffs are without an adequate remedy at law.  Unless the Court enjoins the Secretary of State from maintaining and applying his unlawful voter registration verification protocol, Plaintiffs will continue to suffer the immediate and irreparable harm described herein.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

1.      Enter judgment in favor of Plaintiffs and against Defendant on the claims for relief as alleged in this Complaint;

2.      Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the Georgia voter registration verification protocol (a) violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and (b) violates the fundamental right to vote under the First and Fourteenth Amendments.

3.      Grant Plaintiffs preliminary or permanent injunctive relief by ordering that Defendant:

(a) discontinue the practice of automatically cancelling the registration status of applicants previously placed into pending status who fail to remedy the mismatch or discrepancy within forty days of the issuance of the notification letter;

(b) permit all applicants whose registration applications have not been fully processed or have been cancelled as a result of the Georgia voter registration verification protocol to cast a regular ballot during the early voting period and on Election Day if they present appropriate ID; and

(c) maintain, preserve, and not destroy until after December 31, 2018, any and all records relating to the Georgia voter registration verification program.

4.     Retain jurisdiction over the Defendant for such period of time as may be appropriate to ensure the Defendant's compliance with relief ordered by this Court;

5.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to statute; and

6.     Grant Plaintiffs such other and further relief as may be just and equitable.

Dated: September 14, 2016          Respectfully submitted,

                              By:     */s/ James W. Cobb*
                                        James W. Cobb

Georgia Bar No. 420133
Amy Michaelson Kelly
Georgia Bar No. 215108
T. Brandon Waddell
Georgia Bar No. 252639
Caplan Cobb LLP
75 Fourteenth Street, N.E.
Atlanta, Georgia 30309
Telephone:   (404) 596-5600
Facsimile:   (404) 596-5604
jcobb@caplancobb.com
akelly@caplancobb.com
bwaddell@caplancobb.com


Ezra D. Rosenberg (*pro hac vice – to be filed*)
Julie Houk (*pro hac vice – to be filed*)
John Powers (*pro hac vice – to be filed*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, D.C. 20005
Telephone:   (202) 662-8600
Facsimile:   (202) 783-0857
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
jpowers@lawyerscommittee.org


Michelle Kanter Cohen (*pro hac vice – to be filed*)
Sarah Brannon* (*pro hac vice – to be filed*)
Niyati Shah** (*pro hac vice – to be filed*)
Project Vote
1420 K Street NW, Suite 700
Washington, D.C. 20005
Telephone:   (202) 546-4173
Facsimile:   (202) 733-4762
mkantercohen@projectvote.org
sbrannon@projectvote.org
nshah@projectvote.org
*Authorized to practice only*

*in Maryland.  Practice in DC limited to cases in federal court.*
*\*\*Admitted in New Jersey & New York.  Practice in DC limited to cases in federal court.*

Vilia Hayes (*pro hac vice – to be filed*)
David Wiltenburg (*pro hac vice – to be filed*)
Gregory Farrell (*pro hac vice – to be filed*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:   (212) 837-6000
Facsimile:   (212) 422-4726
vilia.hayes@hugheshubbard.com
david.wiltenburg@hugheshubbard.com
gregory.farrell@hugheshubbard.com

J. Gerald Hebert (*pro hac vice – to be filed*)
Danielle Lang (*pro hac vice – to be filed*)
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, D.C. 20005
Telephone:   (202) 736-2200
Facsimile:   (202) 736-2222
GHebert@campaignlegalcenter.org
DLang@campaignlegalcenter.org

Aderson B. Francois (*pro hac vice – to be filed*)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, D.C. 20001-2075
Telephone:  (202) 661-6701
Facsimile:   (202) 662-9634
abf48@law.georgetown.edu

*Counsel for Plaintiffs*

56