**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, INC., as an organization; and GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., as an organization; | Civil Action Case No. _____ |
|                 Plaintiffs, | |
| v. | **EXPEDITED CONSIDERATION REQUESTED** |
| BRIAN KEMP, in his official capacity as Secretary of State for the State of Georgia, | **ORAL ARGUMENT REQUESTED** |
|                 Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 5

I.      The Parties .................................................................................. 5

II.     Voter Registration in Georgia under State and Federal Law ...................... 10

III.    The Verification Procedure ................................................................. 13

ARGUMENT ........................................................................................... 17

I.      There Is a Substantial Likelihood
        that Plaintiffs Will Succeed on the Merits. .............................................. 17

        A.      Georgia's Verification Procedure Violates Section 2. ..................... 18

                i.      Georgia's verification procedure burdens the right to vote. .... 22

                ii.     Georgia's verification   procedure disparately   impacts
                        minorities. ................................................................. 28

                iii.    The disparate impact of Georgia's verification  procedure
                        on minority voters is caused by and linked  to social and
                        historical conditions producing discrimination  against
                        minority applicants. ..................................................... 30

                iv.     The Gingles factors support the conclusion that the
                        verification  procedure abridges the voting rights of
                        minorities  in Georgia. .................................................. 33

                        (a)      There is a history of discrimination in Georgia. ............ 33

                        (b)      Voting patterns  in Georgia are racially polarized. ......... 37

                        (c)      The socio-economic effects of
                                 discrimination in Georgia are pervasive. ..................... 38

i

(d)   Minorities in Georgia are less
likely to be elected to public office. ............................ 39

(e)   Georgia's elected officials are unresponsive to the
particularized needs of Georgia's minorities. .............. 40

(f)   The relationship between the verification
program and its stated goals is tenuous. ...................... 42

B.   The Verification Procedure Unconstitutionally
Burdens the Fundamental Right to Vote............................................ 43

i.   The Anderson-Burdick Test.................................................... 44

ii.   The Verification Procedures Severely
Burden the Fundamental Right to Vote. ................................ 45

iii.   The Verification Procedure Is Unjustified. ............................. 45

II.   Plaintiffs' Will Suffer Irreparable Harm Absent the Requested Relief. ....... 46

III.   Secretary Kemp Will Not Be Harmed by the Requested Relief. ................. 48

IV.   The Public Interest Weighs Heavily in
Favor of Granting the Requested Relief. ..................................................... 48

CONCLUSION ............................................................................................... 49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ....................................................................... 44

*Brooks v. State Bd. of Elections,*
848 F. Supp. 1548 (S.D. Ga. 1994) ....................................... 34, 35

*Bullock v. Carter,*
405 U.S. 134 (1972) ....................................................................... 46

*Burdick v. Takushi,*
504 U.S. 428 (1992) ................................................... 43, 44, 45, 46

*Burton v. City of Belle Glade,*
178 F.3d 1175 (11th Cir. 1999) .................................................... 19

*Busbee v. Smith,*
549 F. Supp. 494 (D.D.C. 1982) .................................................. 39

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
408 F.3d 1349 (11th Cir. 2005) ........................................ 35, 41, 49

*Common Cause/Ga. v. Billups,*
406 F. Supp. 2d 1326 (N.D. Ga. 2005) ......................... 35, 36, 47, 48

*Common Cause/Ga. v. Billups,*
439 F. Supp. 2d 1294 (N.D. Ga. 2006) .................................... 31, 43

*Common Cause/Ga. v. Billups,*
554 F.3d 1340 (11th Cir. 2009) .................................................... 36

*Dunn v. Blumstein,*
405 U.S. 330 (1972) ....................................................................... 45

*Fl. State Conference of the Nat'l Ass'n for the Advancement of
Colored People v. Browning,* 522 F.3d 1153 (11th Cir. 2008) .......................... 9

71851072_3

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Frank v. Walker,*
768 F.3d 744 (7th Cir. 2014) .......................................................... 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ...................................................................... 9

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs,*
118 F. Supp. 3d 1338 (N.D. Ga. 2015) ......................................... 49

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs,*
950 F. Supp. 2d 1294 (N.D. Ga. 2013) ................................... 35, 37

*Georgia v. Ashcroft,*
195 F. Supp. 2d 25 (D.D.C. 2002) ................................................ 37

*Hall v. Holder,*
955 F.2d 1563 (11th Cir. 1992) .................................................... 37

*Hunt v. Washington State Apple Adver. Comm'n,*
432 U.S. 333 (1977) ...................................................................... 9

*Hunter v. Hamilton Cnty. Bd. of Elections,*
635 F.3d 219 (6th Cir. 2011) ........................................................ 49

*Jenard v. Comm'r, Ga. Dept. of Corr.,*
457 Fed. App'x 837 (11th Cir. 2012) ........................................... 17

*Johnson v. Miller,*
864 F. Supp. 1354 (S.D. Ga. 1994) .............................................. 34

*League of Women Voters of N.C. v. North Carolina,*
769 F.3d 224 (4th Cir. 2014) .............................................. 19, 20, 21

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................... 9

*Morales v. Handel,*
No. 1:08-CV-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) ................... 36

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012)....................................................44

*Ohio State Conf. of the NAACP v. Husted*,
   768 F.3d 524 (6th Cir. 2014)..............................................19, 27

*Project Vote v. Kemp*,
   No. 1:16-cv-2445 (WSD) (N.D. Ga. Aug. 19, 2016) .....................................16

*Rogers v. Lodge*,
   458 U.S. 613 (1982) .......................................................21

*Thornburg v. Gingles*,
   478 U.S. 30 (1986).....................................................*passim*

*Touchston v. McDermott*,
   234 F.3d 1133 (11th Cir. 2000) ....................................................46

*United States v. Charleston Cnty.*,
   365 F.3d 341 (4th Cir. 2004).......................................................18

*United States v. Georgia*,
   466 F.2d 197 (5th Cir. 1972)........................................................34

*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) ........................................17

*United States v. Georgia*,
   C.A. No. 12972 (N.D. Ga. 1969)....................................................34

*United States v. McLeod*,
   385 F.2d 734 (5th Cir. 1967)........................................................43

*Veasey v. Abbott*,
   No. 14-41127, 2016 WL 3923868 (5th Cir. July 20, 2016)
   (en banc)................................................. 19, 20, 21, 27

*Washington Ass'n of Churches v. Reed*,
   492 F. Supp. 2d 1264 (W.D. Wa. 2006) ..................................47, 49

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Wesberry v. Sanders*,
  376 U.S. 18 (1964) ........................................................................... 43

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ......................................................................... 43

## Constitutional Provisions

GA. CONST. ARTICLE 2, § 1, ¶ II ................................................... 10

## Statutes and Rules

52 U.S.C. § 10301 ...................................................................... 18, 21

52 U.S.C. § 10304 ........................................................................... 37

52 U.S.C. § 10310 ........................................................................... 18

52 U.S.C. § 21083 ................................................................ 10, 11, 12

FED. R. CIV. P. 65 ........................................................................... 48

GA. CODE ANN. § 21-2-50 ............................................................... 9

GA. CODE ANN. § 21-2-210 ............................................................. 9

GA. CODE ANN. § 21-2-216 ...................................................... 10, 12

GA. CODE ANN. § 21-2-220 ............................................................ 42

GA. CODE ANN. § 21-2-226 ............................................................ 10

GA. CODE ANN. § 21-2-417 ............................................................ 42

## PRELIMINARY STATEMENT

Plaintiffs request that the Court issue an order enjoining the Defendant, Georgia Secretary of State Brian Kemp, from enforcing a discriminatory policy that will otherwise prevent thousands of eligible Georgia residents from voting on November 8.  Secretary Kemp has implemented an outmoded and discredited procedure (the "verification procedure") under which the information on facially complete voter registration applications must match exactly—character-by-character and digit-by-digit—information maintained by the Georgia Department of Drivers Services ("DDS") or the Social Security Administration ("SSA").  The result is thousands of inappropriately rejected applications, and the adverse impact is disproportionately borne by Black, Hispanic and Asian-American voters.  From July 6, 2013 to May 17, 2016, voter registration applicants self-identified as 47.2 percent White, 29.4 percent Black, 3.6 percent Hispanic, and 2.6 Asian-American. Yet during roughly the same period, of the applicants who failed Secretary Kemp's verification procedure, 13.6 percent were White, 63.6 percent were Black, 7.9 percent were Hispanic, and 4.8 percent were Asian-American.

Voter registration applicants whose applications fail to verify have 40 days to cure the purported deficiency in their applications.  As of July 15, 2016, approximately 7,696 voter registration applications were listed as "pending" in

Georgia's voter registration system for failing the verification procedure. These applications are in immediate danger of being rejected—if they have not been already—and applicants who fail to either cure within the 40-day period or submit a new voter registration application before Georgia's October 11, 2016 registration deadline may be disenfranchised. Moreover, it is likely that a significant number of new voter registration applications will fail DDS or SSA matching as well. The SSA matching process is especially dysfunctional: from July 23 to August 27, 2016, 42 percent, or 6,442, of the 15,161 voter registration applications that Georgia submitted to the SSA for verification failed to match.

The verification procedure imposes needless barriers in the voter registration process and thus significantly increases the costs of voting for applicants of lower socioeconomic status, who are more likely to be minorities as a result of Georgia's pervasive history of discrimination. They are more likely to experience failure to match errors and less likely to have the time or the means to navigate through Secretary Kemp's procedure to verify the information in their registration applications. Indeed, voter registration applicants of lower socioeconomic status are more likely to become trapped in the worst aspect of Secretary Kemp's verification procedure: because minority applicants are less likely to have a Georgia driver's license, they are more likely to be relegated to the SSA's

matching process, which the SSA's own Inspector General found to be error-prone and unreliable and is responsible for most of the failure to match rejections imposed by Secretary Kemp.

The increased barriers that minority applicants face in completing Secretary Kemp's verification procedure are the direct result of social and historical conditions in Georgia that produce discrimination against minorities. Disparities in socioeconomic status—including higher poverty and unemployment rates for minorities, as well as lower levels of educational attainment and less access to transportation—are the result of Georgia's long history of pervasive racial discrimination. These socioeconomic conditions interact with Secretary Kemp's verification procedure to disproportionately burden minority applicants.

Secretary Kemp's verification procedure severely burdens the fundamental right to vote without advancing Georgia's asserted justification of preventing voter fraud. This interest is already adequately protected by federal and Georgia state election law, including the Help America Vote Act of 2002 ("HAVA") and Georgia's voter-identification law. Without the requested relief, the multitude of Georgia residents whose voter registration applications have been and will be rejected will be unable to vote in the upcoming 2016 presidential election and will suffer irreparable harm as a result.

In light of the compelling evidence, Plaintiffs have a substantial likelihood of succeeding on their claims that Secretary Kemp's verification procedure violates Section 2 of the Voting Rights Act of 1965 ("Section 2") and unconstitutionally burdens the fundamental right to vote protected by the First and Fourteenth Amendments to the United States Constitution. At the same time, the relief sought in Plaintiffs' Motion is precisely tailored to the present situation and essentially cost-free, as it is based on the existing practice of permitting applicants who failed to match within 30 days of the election to vote if they produce appropriate identification at the time of voting. Plaintiffs request only that Secretary Kemp be required to extend to all failure to match applicants the same opportunity currently afforded to those who fail to match within 30 days before an election: the ability to vote upon presentation of appropriate identification at the polls. The public interest weighs strongly in favor of the requested relief because it will prevent disenfranchisement of thousands of Georgia residents and support public confidence in the integrity of Georgia's election procedures.

## STATEMENT OF FACTS[1]

### I.   The Parties

Plaintiffs Georgia State Conference of the National Association for the Advancement of Colored People ("Georgia NAACP"), the Georgia Coalition for the People's Agenda ("GCPA") and Asian Americans Advancing Justice-Atlanta ("Advancing Justice") are non-profit organizations whose missions include, among other things, community development, community organization, voter registration, and voter education and outreach.  (Johnson Decl. ¶¶ 3, 5; Butler Decl. ¶¶ 4-5; Cho Decl. ¶ 3.)

Georgia NAACP is a non-partisan, interracial, nonprofit membership organization.  (Johnson Decl. ¶ 2.)  Its mission is to eliminate racial discrimination

---

1.  The following is based on the following declarations and the exhibits thereto: (i) the Declaration of Francys Johnson, dated September 12, 2016 (the "Johnson Decl.," attached as Exhibit 1 to Plaintiffs' Emergency Motion for Preliminary Injunction (the "Motion")); (ii) the Declaration of Helen Butler, dated September 10, 2016 (the "Butler Decl.," attached as Exhibit 2 to the Motion); (iii) the Declaration of Stephanie Cho, dated September 6, 2016 (the "Cho Decl.," attached as Exhibit 3 to the Motion); (iv) the Declaration of Gary O. Bartlett, dated September 5, 2016 (the "Bartlett Decl.," attached as Exhibit 4 to the Motion); (v) the Declaration of Christopher Brill, dated September 13, 2016 (the "Brill Decl.," attached as Exhibit 5 to the Motion); (vi) the Declaration of Michael McDonald, dated September 12, 2016 (the "McDonald Decl.," attached as Exhibit 6 to the Motion); (vii) the Declaration of Amos Amoadu Boadai, dated August 26, 2016 (the "Boadai Decl.," attached as Exhibit 7 to the Motion); and (viii) the Declaration of Julie M. Houk, dated September 13, 2016 (the "Houk Decl.," attached as Exhibit 8 to the Motion).

through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African-Americans. (Johnson Decl. ¶ 3.) It is headquartered in Atlanta and currently has approximately 10,000 members. (Johnson Decl. ¶ 4.) The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, get-out-the-vote efforts, election protection, and census participation. (Johnson Decl. ¶ 5.) The Georgia NAACP regularly conducts voter registration drives and has submitted many voter registration applications to elections officials throughout Georgia. (Johnson Decl. ¶ 6.) Voter registration applications filled out by Georgia NAACP members who are eligible to register to vote have likely been rejected as a result of the verification procedure; and voter registration applications filled out by current NAACP members (and citizens who will be recruited as members in the future) who are eligible to register to vote will likely be rejected in the future. (Johnson Decl. ¶¶ 15-16.) Additionally, minority applicants who attempted to register to vote through registration drives conducted by the Georgia NAACP have very likely had their applications rejected due to the verification procedure. (Johnson Decl. ¶ 15.) Georgia's verification procedure is causing and will continue to cause harm to the Georgia NAACP's mission to ensure political equality and has caused

and will continue to cause harm to the Georgia NAACP by causing it to divert a portion of its financial and other organizational resources to educating voters about the procedure and assisting potential voters whose applications have been rejected. (Johnson Decl. ¶¶ 22-23.)  As a result, the Georgia NAACP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and get out the vote efforts.  (Johnson Decl. ¶ 24.)

GCPA is a Georgia not-for-profit corporation with its principal place of business located in Atlanta, Georgia.  (Butler Decl. ¶ 2.)  The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.  (Butler Decl. ¶ 3.)  The organization encourages voter registration and participation, particularly among minority and low-income citizens.  (Butler Decl. ¶ 4.)  The GCPA's support of voting rights is central to its mission.  (Butler Decl. ¶ 5.)  The organization has committed, and continues to commit, time and resources to conducting voter registration drives, voter education, voter ID assistance, Souls-to-the-Polls, and other get-out-the-vote efforts in Georgia, such as a "Post the Peach" initiative to encourage turnout.  (Butler Decl. ¶ 5.)  African American applicants who attempted to register to vote through registration drives conducted by GCPA have had their applications rejected due to the verification procedure.

(Butler Decl. ¶ 14.) Georgia's verification procedure is causing and will continue to cause harm to the GCPA's mission to encourage voter registration and participation by minority populations and has caused and will continue to cause harm to GCPA by causing it to divert a portion of its financial and other organizational resources to educating voters about the procedure and assisting potential voters whose applications have been rejected. (Butler Decl. ¶ 29.) As a result, the GCPA is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and get out the vote efforts. (Butler Decl. ¶ 30.)

Advancing Justice is a non-partisan, nonprofit organization that was founded in 2010. (Cho Decl. ¶¶ 3, 5.) The organization's mission includes protecting and promoting the civil rights of Asian Americans in Georgia through public policy, legal education, civic engagement, and leadership development. (Cho Decl. ¶ 3.) Advancing Justice engages in voter registration, voter education, and get-out-the-vote efforts in Georgia, with a particular focus on newly naturalized immigrant and refugee Asian Americans. (Cho Decl. ¶¶ 5, 6.) Minority applicants who attempted to register to vote through registration drives conducted by Advancing Justice likely have had their applications rejected due to the verification procedure. (Cho Decl. ¶ 18.) Georgia's verification procedure is causing and will continue to cause

harm to Advancing Justice's mission to promote the civil rights of Asian immigrants and has caused and will continue to cause harm to Advancing Justice by causing it to divert a portion of its financial and other organizational resources to educating voters about the procedure and its impact on the registration process. (Cho Decl. ¶ 19.)  As a result, Advancing Justice is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and get out the vote efforts.  (Cho Decl. ¶ 19.)

The Georgia NAACP, GCPA, and Advancing Justice have standing on their own behalf to pursue injunctive relief.[2]  The Georgia NAACP also has standing to seek injunctive relief on behalf of its members.[3]

Defendant Brian P. Kemp is the Secretary of State of the State of Georgia. Under Georgia state law, the Secretary of State is the Chief Elections Administrator for the State of Georgia—*i.e.*, the highest-ranking state elections official.  O.C.G.A. § 21-2-210.   The Elections Division of the Secretary of State's Office organizes and oversees all election activity, including voter registration, and

---

2. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Fl. State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008).

3. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

municipal, state, county, and federal elections.  Under Georgia election law, the Secretary of State has the duty to maintain the official list of registered voters for the State of Georgia and the list of inactive voters.  O.C.G.A. § 21-2-50(a)(14). Secretary Kemp is sued in his official capacity.

## II.   <u>Voter Registration in Georgia under State and Federal Law</u>

The Georgia State Constitution expressly recognizes the fundamental right to vote. GA. CONST. ART. 2, § 1, ¶ II.  Under Georgia state law, to be eligible to vote a person must be:  (1) "Registered as an elector in the manner prescribed by law;" (2) "A citizen of [Georgia] and of the United States;" (3) "At least 18 years of age;" (4) "A resident of [Georgia] and of the county or municipality in which he or she seeks to vote;" and (5) "Possessed of all other qualifications prescribed by law." O.C.G.A. § 21-2-216(a).  The county board of registrars for each county is responsible for determining the eligibility of voter registration applicants. *Id.* Georgia voter registration applications require a person to provide their first and last name, date of birth, and either their Georgia driver's license number, Georgia identification card number, or the last four digits of their social security number. (*See State of Georgia Application for Voter Registration*, GA. SEC'Y OF STATE, http://sos.ga.gov/admin/files/Voter_Registration_ Application_8-10.pdf.)

Under HAVA, Georgia is required to maintain a centralized, computerized statewide voter registration database as the single system for storing and managing Georgia's official list of registered voters. 52 U.S.C. § 21083(a)(1)(A)(i). All voter registration information obtained by local election officials in Georgia must be electronically entered into the database on an expedited basis at the time the information is provided. *Id.* § 21083(a)(1)(A)(vi).

HAVA also requires Georgia to undertake certain verification activities. *Id.* § 21083(a)(5). Voter registration applicants who have a current and valid driver's license must provide their driver's license number on the application. *Id.* § 21083(a)(5)(A)(i)(I). Applicants who lack a current driver's license must provide the last four digits of their social security number. *Id.* § 21083(a)(5)(A)(i)(II).

HAVA requires that Georgia's chief election official enter into an agreement with DDS "to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." *Id.* § 21083(a)(5)(B)(i). DDS must, in turn, enter into an agreement with the Commissioner of SSA for the same purpose. *Id.* § 21083(a)(5)(B)(ii).

HAVA does *not* mandate that voter registration applications be rejected if the information contained on the application fails to match exactly fields in the DDS or SSA databases. *See generally* 52 U.S.C. § 21083. To the contrary, HAVA provides an alternative procedure for applicants whose information produces a non-match with the DDS or SSA databases. It requires that first-time applicants who register to vote by mail and whose identity is not verified by either the match with DDS or SSA must provide proof of identification either with their registration application or when voting for the first time. *Id*. § 21083(b). Satisfactory proof of identification ("HAVA ID") includes a copy of a current utility bill, bank statement, government check, paycheck, other government document showing the name and address of the voter, or any current and valid photo identification. *Id.* § 21083(b)(2)(A).

Moreover, there is no requirement under Georgia law that voter registration applications be rejected if the information contained on the application fails to match exactly fields in the DDS or SSA databases. Under Georgia state law, the Secretary of State is required only "to establish procedures to match an applicant's voter registration information to the information contained in the database maintained by [DDS] for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant

has provided satisfactory evidence of United States citizenship."  O.C.G.A. § 21-2-216(g)(7).

Nowhere do the governing statutes, federal or state, provide or suggest that trivial inconsistencies between the reference databases and a voter's application should be grounds for rejection and disenfranchisement.

## III.   The Verification Procedure

Georgia's verification procedure is an administrative policy (not a statute or regulation) which the State of Georgia described in a document submitted for preclearance under Section 5 of the Voting Rights Act on August 17, 2010. (Bartlett Decl., Ex. 2, the "Section 5 Submission.")  Under Georgia's verification procedure, the information provided in every incoming voter registration application is entered into Georgia's statewide voter registration system. (Section 5 Submission, Ex. 1 at 1.)  On a nightly basis, the Secretary of State submits this information, except for applications received from DDS, to DDS for verification. (Section 5 Submission, Ex. 1 at 1.)

If the applicant supplied a Georgia driver's license number or identification card number on their application, DDS attempts to verify the following information from the application, as entered into the voter registration database, against the information maintained by DDS:  (1) first name, (2) last name, (3) date

of birth, (4) driver's license number or identification card number, (5) last four digits of the applicant's Social Security number, and (6) United States citizenship status. (Section 5 Submission, Ex. 1 at 1-2.) In order to be verified, the information in the voter registration database must match exactly the information maintained by DDS. (Section 5 Submission, Ex. 1 at 2.)

If the applicant supplied only the last four digits of their Social Security number, DDS will submit the information on the application, as entered into the voter registration database, to the Social Security Administration ("SSA"). (Section 5 Submission, Ex. 1 at 2.) SSA will then attempt to verify the following information from the voter registration database against information maintained by the SSA: (1) first name, (2) last name, (3) date of birth, and (4) last four digits of Social Security number. (Section 5 Submission, Ex. 1 at 2.) In order to be verified, the information in the voter registration database must match exactly the information maintained by SSA. (Bartlett Decl., Ex. 9, the "IG Report," at 5.)

If the information in the voter registration database does not match exactly with either the DDS or SSA information, then the county board of registrars processing the application is required to mail the applicant a letter—in English only—informing the applicant that their information could not be verified. (Section 5 Submission, Ex. 1 at 4.) If the applicant does not respond to the

14

deficiency letter in time, then the application may be rejected.[4] (Section 5 Submission, Ex. 1 at 4.)

The Georgia Secretary of State has provided guidance to the county registrars concerning how to implement Georgia's verification procedure. (*See generally* Bartlett Decl., Ex. 3, Georgia Registrar Official Certification Course No. 4, "Registration Basics," at 49-53.)  If the applicant does not pass the verification procedure, their application status in Georgia's voter registration database will appear as pending and the system will generate a form deficiency letter. (Registration Basics at 50.)  Though the Section 5 Submission provides that unresponsive applicants will be cancelled after 30 days, Georgia's system starts a 40-day clock for the applicant to respond to the deficiency letter after it is printed. (Registration Basics at 50.)  If the 40 days pass without a response from the applicant, the system will reject the application.  (Registration Basics at 52.) While the letters for a DDS non-match may specify the information that did not match, the letters for an SSA non-match do not.  (*Compare* Section 5 Submission, Exhibit 1 at 8-9 *with* Section 5 Submission, Exhibit 1 at 10-11.)

_____

4.  Georgia's registration system refers to applicants who failed the verification procedure and were therefore not added to the State's official list of eligible voters as "cancelled" status applicants.

The county registrar can stop the 40-day clock at any point to prevent an application from being rejected.  (Motion, Ex. 9, Transcript of Deposition of Merritt Beaver ("30(b)(6) Dep. Tr."), at 107:24-108:1,  *Project Vote v. Kemp*, No. 1:16-cv-2445  (WSD) (N.D. Ga. Aug. 19, 2016).)  Thus, if the registrar determines that information did not verify because of DDS errors in entering information, the county registrar may correct the errors.  (Registration Basics at 53.)  If the mismatch with the information maintained  by DDS is due to a data entry error by DDS or use of variations on names, *e.g.*, the use of a nickname, the registrar may, in an exercise of discretion, accept the application.  (Registration Basics at 53.) This partial approach to failure to match errors, while  recognizing the frequency of such errors, nevertheless  permits many erroneous DDS failures  and all SSA failures  to go un-remedied,  with severe consequences for the affected applicants.

The consequences are less severe if the applicant applies to register to vote before the voter registration  deadline for an upcoming election and the application has not yet been rejected as of the Election Day.  Under these circumstances, the voter is allowed to vote so long as the voter provides the necessary information  at the time of voting. (Section 5 Submission at 5.)  No reason is given  why this same common-sense approach is not applied to all  failure to match applicants.

## ARGUMENT

The decision to issue a preliminary injunction lies within the sound discretion of the Court. *United States v. Georgia*, 892 F. Supp. 2d 1367, 1372 (N.D. Ga. 2012). The Court may grant a preliminary injunction upon a showing by the moving party that: (1) "it has a substantial likelihood of success on the merits;" (2) "irreparable injury will be suffered unless the injunction issues;" (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;" and (4) "if issued, the injunction would not be adverse to the public interest." *Jenard v. Comm'r, Ga. Dept. of Corr.*, 457 Fed. App'x 837, 838 (11th Cir. 2012).

## I.      There Is a Substantial Likelihood that Plaintiffs Will Succeed on the Merits.

The Complaint alleges that Secretary Kemp's procedure of preventing voters from registering to vote if their applications do not match exactly with records maintained by the DDS or SSA violates Section 2 (Count I) and unconstitutionally burdens the fundamental right to vote protected by the First and Fourteenth Amendments to the United States Constitution (Count II). The Plaintiffs have a substantial likelihood of succeeding on these claims.

A.     **Georgia's Verification Procedure Violates Section 2.**

The procedure implemented by Secretary Kemp violates Section 2, which prohibits states and political subdivisions from using any voting "standard, practice or procedure . . . which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]." 52 U.S.C. § 10301(a).  The right to vote is broadly defined to include "all action necessary to make a vote effective," including, among other things, "registration, . . . casting a ballot, and having such ballot counted properly." *Id.* § 10310(c)(1).

Section 2 prohibits "not only voting practices borne of a discriminatory intent, but also voting practices that 'operate, designedly or otherwise,' to deny 'equal access to any phase of the electoral process for minority group members.'" *United States v. Charleston Cnty.*, 365 F.3d 341, 345 (4th Cir. 2004) (quoting S. REP. NO. 97-417, at 28, 30 (1982)).  A procedure violates Section 2 if it is established that, based upon the totality of the circumstances, it results in "members [of a protected class] hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *see also Thornburg v. Gingles*, 478 U.S. 30, 35 (1986) (stating that violations of Section 2 of the Voting Rights Act can "be

18

proved by showing discriminatory effect alone").  While many Section 2 cases

address vote dilution—wherein an electoral structure dilutes the effect of minority

votes—Section 2 also protects against vote denial by prohibiting electoral

procedures that discriminatorily impede minority voters' ability to cast a ballot in

the first place.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1196 (11th Cir.

1999) (stating that "two distinct types of discriminatory practices and procedures

are covered under section 2:  those that result in 'vote denial' and those that result

in 'vote dilution'").

　　　While the Court of Appeals for the Eleventh Circuit has not formally

adopted a standard tailored to Section 2 vote-denial claims, the Courts of Appeals

for the Fourth, Fifth, and Sixth Circuits have developed a two-part framework to

evaluate Section 2 claims based on discriminatory practices that result in vote

denial.  *See Veasey v. Abbott*, — F.3d — , No. 14-41127, 2016 WL 3923868, at

*17-18 (5th Cir. July 20, 2016) (*en banc*); *League of Women Voters of N.C. v.

North Carolina*, 769 F.3d 224, 241 (4th Cir. 2014);  *Ohio State Conf. of the NAACP

v. Husted*, 768 F.3d 524, 550-51 (6th Cir. 2014), *vacated on other grounds*, No.

14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

　　　Under this two-part framework, courts first examine whether the challenged

practice disproportionately burdens members of a protected class, *i.e.*, results in a

"disparate effect." *See Veasey*, 2016 WL 3923868 at \*17. The evidence presented in support of this Motion conclusively establishes a disparate effect on racial minorities. The second part of the framework examines whether the disparate burden is, at least in part, causally linked to discriminatory social and historical conditions affecting minorities "currently, in the past, or both." *Id.*[5]

When assessing both prongs of the framework, "courts should consider the totality of the circumstances." *League of Women Voters*, 769 F.3d at 240 (citation and internal quotation marks omitted). In *Gingles*, the Supreme Court set forth nine non-exclusive factors that courts analyze in determining "whether there is a sufficient causal link between the disparate burden imposed and social and

---

5. The United States Court of Appeals for the Seventh Circuit has adopted a similar two-part framework to evaluate Section 2 vote denial claims but has expressed skepticism concerning part two of the Fourth, Fifth, and Sixth Circuit framework "because it does not distinguish discrimination by the defendants from other persons' discrimination." *Frank v. Walker*, 768 F.3d 744, 754-55 (7th Cir. 2014). In any event, Secretary Kemp's matching procedure violates Section 2 under the Seventh Circuit standard as well because the State of Georgia, which has a long history of discrimination, created the discriminatory social and historical conditions that interact with Secretary Kemp's verification procedures to disenfranchise thousands of eligible minority voters in Georgia. (*See infra* Section I.A.iv.a.)

historical conditions produced by discrimination." *Veasey*, 2016 WL 3923868 at *18; *see also Gingles*, 478 U.S. 30, 36-37, 44-45.[6]

Section 2, "on its face, is local in nature." *League of Women Voters*, 769 F.3d at 243. It expressly directs courts to assess whether the political processes "in the state or political subdivision are not equally open" to minority citizens. 52 U.S.C. § 10301(b). Accordingly, the Section 2 inquiry "is peculiarly dependent upon the facts of each case and requires an 'intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (quoting *Rogers v. Lodge*, 458 U.S. 613, 621-22 (1982)).

---

6. Non-exclusive factors include: (1) "the history of voting-related discrimination in the State or political subdivision;" (2) "the extent to which voting in the elections of the State or political subdivision is racially polarized;" (3) "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;" (4) "the exclusion of members of the minority group from candidate slating process;" (5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;" (6) "the use of overt or subtle racial appeals in political campaigns;" (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction;" (8) "whether there is a significant lack of responsiveness on the part of elected officials to particularized needs of the members of the minority group;" and (9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36-37, 44-45 (internal quotation marks omitted). No one factor is dispositive and "there is no requirement that any particular number of factors be proved, or . . . that the majority of them point one way or the other." *League of Women Voters*, 769 F.3d at 240 (internal quotation and citation omitted).

i.     *Georgia's verification procedure burdens the right to vote.*

Georgia's verification procedure results in the rejection of voter registration applications by eligible voters, as defined by Georgia state law, often through no fault of the applicant. As set forth in the declaration of Gary O. Bartlett, a former Executive Director of the North Carolina State Board of Elections, errors may occur throughout the verification procedure, resulting in the disenfranchisement of voters.

The problems begin with the very first step: the country registrar enters the information from the voter registration application into Georgia's voter registration database. It is inevitable that there will be errors when information from paper applications is entered manually into an electronic system, including simple typos, misread handwriting, computer-system glitches, and other innocent or trivial errors. (*See* Bartlett Decl. ¶ 64.)

Such innocent or trivial errors often become determinative when DDS and the SSA attempt to match the inputted information with their own records. The same types of data-entry errors and technical glitches that occur at the county level are also likely to have occurred when DDS and SSA created their records. (*See* Bartlett Decl. ¶¶ 53-55.) False mismatches may also occur because of minor differences between the information on the voter registration application and the

information contained in the database. (*See* Bartlett Decl. ¶¶ 22-24.)  Even a minor

omission, such as the failure to include a hyphen in a hyphenated name, can return

an erroneous result.  The use of a married name in one database and a maiden

name in the other, or minor differences in the street name in the applicant's

address, will also prevent eligible voters from being matched.  These types of

foreseeable errors in Georgia's verification procedure result in the

disenfranchisement of thousands of eligible voters.  (Bartlett Decl. ¶¶ 29, 45.)

The Inspector General for the SSA has recognized that false results are

likely to occur when states attempt to verify information against the SSA's

database.  In a June 2009 report, the Inspector General concluded that the SSA's

matching process has a higher than expected no-match response rate.  (Bartlett

Decl., Ex. 9 (the "IG Report") at 4-5.)  The Inspector General noted the "limitation

of the . . . matching criteria," including the fact that SSA "does not use a truly

unique identifier, such as the full SSN to match voter information to its records."

(IG Report at 5.)  The Inspector General found that the "program does not allow

flexibility with matching the name and [date of birth] to its records to compensate

for typographical errors, other common database errors, and mistakes because it

does not use the full SSN." (IG Report at 5.)  The Inspector General also found

apparent anomalies in the matching program, resulting in responses "initially

indicat[ing] a match response" subsequently being changed to "a no-match response when the same data (name, SSN, [date of birth], and last four digits of the SSN) were entered into the verification program." (IG Report at 4.)

With studied understatement, the IG Report concluded that the SSA's matching process "may be providing a high number of false negative responses to the States, which may lead to applicants having difficulty while registering to vote." (IG Report at 5.) Tellingly, the SSA's "no-match response rate was 31 percent, while the no-match response rate for other verification programs used by the States and employers ranged from 6 to 15 percent." (IG Report at 4.)

The evidence presented in Plaintiffs' Motion shows that the situation has not improved since the Inspector General's 2009 Report. From July 23 to August 27, 2016, 42 percent, or 6,442, of the 15,161 voter registration applications that Georgia submitted to the SSA for verification failed to match.[7] As Dr. Michael P. McDonald, a political science professor at the University of Florida and expert on U.S. elections, concluded, the SSA matching process that Georgia relies upon to

---

7. SSA provides weekly voter registration reports that include data regarding registration applications that matched, and those that failed to match ("Total Matches" and "Total Non Matches," respectively), in all 50 states. *Help America Vote Verification (HAVV) Usage by State: Weekly HAVV Transactions by State*, SOC. SEC. ADMIN., https://www.ssa.gov/open/havv/havv-weekly-jul-30-2016.html (last visited Sept. 13, 2016). The above statistics were calculated by compiling the weekly "Total Non Matches" and "Total Matches" in Georgia between July 23, 2016 and August 27, 2016. (*See* Houk Decl. ¶ 23.)

determine who is eligible to vote is highly error-prone. (McDonald Decl., Ex. 2

(the "McDonald Report") at 10-14.)

Indeed, Georgia county registrars have experienced and documented

matching problems in implementing the verification procedure. (*See, e.g.*, Bartlett

Decl., Ex. 8 at 68-69 ("In many cases, it is common sense corrections to name that

must be made. DDS commonly doesn't put foreign names in correctly when

people apply.").) The procedure can also prevent a voter who presents valid

documentation from being approved as an active voter. An email chain between

Carroll County registrar Leslie Robinson and John Hallman shows that some

voters who were manually approved as active voters after presenting valid

naturalization papers were still being rejected by the system after it re-verified

information against DDS records and found mismatched information. (Bartlett

Decl., Ex. 8 at 68-69.)

Dr. McDonald explains that the exact-match procedure used by Georgia "is

a method that is at least fifty years out-of-date." (McDonald Report at 8.) The

verification procedure results in the disenfranchisement of tens of thousands of

eligible voters, many of whom submitted facially complete and accurate voter

registration applications. Conservatively, from July 2013 to the present,

approximately 36,800 voter registration applications have been suspended or

rejected because the information on the application did not exactly match the

information in the SSA or DDS databases. (McDonald Report at 17.) Apart from

its random and capricious qualities, the verification procedure also turns the act of

filling out a voter registration application into a functional test, not unlike a literacy

test, and imposes an additional burdensome requirement on applicants who make a

minor mistake (or are the victim of a data-entry error) by requiring them to contact

election officials and provide updated information to complete their application.[8]

Section 2 prohibits the specific burdens that the verification procedure

places on the ability to vote. *See Veasey*, 2016 WL 3923868 at *25-27 (affirming

---

8.  The burden that the procedure imposes is illustrated by an example of a
    Georgian who was disenfranchised by it. Amos Boadai, a Ghanaian immigrant
    who is a naturalized citizen serving in the United States Army, moved from
    Virginia to Georgia in 2013. (Boadai Decl. ¶ 3.) Mr. Boadai completed a voter
    registration application on May 19, 2014 (Boadai Decl., Ex. 1), which was
    processed by Muscogee County election officials on September 8, 2014. All of
    the personal information that Mr. Boadai supplied on his voter registration
    application was correct. (Boadai Decl. ¶ 10.)

    On September 10, 2014, a record was returned to a local election official that
    the information failed to match with a corresponding field in the SSA database.
    The record does not state what data field or fields failed to match the database.
    Georgia's registration database indicates that Mr. Boadai was sent two letters
    dated September 10, 2014, but Mr. Boadai did not receive either letter. (Boadai
    Decl. ¶ 14.) On October 20, 2014, Mr. Boadai's application was automatically
    cancelled in Georgia's system. Georgia's registration database indicates that a
    letter was sent to Mr. Boadai on October 20, 2014, but Mr. Boadai did not
    receive that letter, either. (Boadai Decl. ¶ 15.) Because Mr. Boadai never
    received his registration information, he did not attempt to vote in the
    November 2014 general election and was disenfranchised. (Boadai Decl. ¶ 16.)

the district court's finding that Texas's voter ID law imposed a significant burden on the right to vote); *Ohio State Conf. of the NAACP*, 768 F.3d at 555-56 (affirming district court's finding that Ohio law imposed a burden).

The burdens imposed by the verification procedure cause both an immediate and long-term harm to voter participation. (McDonald Report at 32.) Election scholars often analyze the determinants of voting using a simple formula: an individual will vote if the benefits outweigh the costs. (McDonald Report at 29.) Georgia's verification procedure imposes the highest costs on applicants of low socioeconomic status. Applicants having less education or less money are more likely to be affected by errors and less likely to jump through the administrative hoops to verify the information on their voter registration applications. Indeed, on average, applicants whose registration applications are cancelled for failure to match live in parts of Georgia that are poorer than the rest of the state. (Brill Decl., Ex. 1, the ("Brill Report") at 9.) And as explained *infra* (Section I.A.iii), minorities are disproportionately of low socioeconomic status in Georgia because of historical and ongoing discrimination.

      ii.    *Georgia's verification procedure*
              *disparately impacts minorities.*

Cancellations of voter registration applications resulting from the verification procedure have a significant and racially disparate impact on Black, Hispanic, and Asian-American applicants.

Of applicants who had voter registration applications canceled between July 7, 2013 and July 15, 2016, for failing to match DDS or SSA information, 63.6 percent were Black and only 13.6 percent were White. (Brill Report at 2-3.) During roughly the same time, however, the total pool of applicants was 29.4 percent Black and 47.2. percent White. (Brill Report at 2-3.) Hispanic applicants made up 7.9 percent of the canceled applications but were only 3.6 percent of the total pool of applicants. (Brill Report at 2-3.) Asian or Pacific Islander applicants were 4.8 percent of the cancelled applications but were only 2.6 percent of the total pool of applicants. Stated differently, Black applicants were 8.1 times more likely to have their registration applications not verified than were White applicants; Hispanic applicants 7.5 times more likely; and Asian applicants 6.7 times more likely. (*See* Brill Report at 5.)

This same disparity exists for voter registration applications cancelled because information was "Not Verified" against the information in the DDS and SSA databases. Approximately 8,267 applications were rejected between July 7,

2013 and July 15, 2016 because they failed to match information in the DDS database—of which only approximately 1,592 (19.3 percent) identified as White, while 4,228 (approximately 51.1 percent) identified as Black, 1,167 (14.1 percent) identified as Latino, and 640 (7.7 percent) identified as Asian. (McDonald Report at 18).[9]  Even more stark are the demographics of the 21,844 applications that were rejected because they failed to match with information in the SSA database.  Of these, approximately 2,160 (9.9 percent) identified as White, 16,067 (73.6 percent) identified as Black, 1,005 (4.6 percent) identified as Latino, and 380 (1.7 percent) identified as Asian.  *Id.*  Thus, between July 2013 and July 15, 2016, Black, Hispanic and Asian voter registration applicants were vastly overrepresented in having their voter registration applications cancelled because of Georgia's verification procedure.[10]

_____

9.  Additionally, disproportionate effects are also seen in the demographics of voter registration applications that have been rejected because of a non-match specifically with the citizenship data at DDS. Approximately, 1,299 applicants have been rejected for this non-match—of which, 13.9 percent identified as White, 30.4 percent identified as Black, 21.2 percent identified as Latino, and 25.1 percent identified as Asian-American.  (Brill Report at 3, Table 1).

10. In fact, "Black applicants are three and half times more often in cancelled or pending status due to SSA exact match failure (19,642) than DDS failure (5,571).  In contrast, White applicants are only 31 percent more likely to be in pending or cancelled status due to failing SSA match (2,498) than DDS match (1911)."  (McDonald Report at 26-27.)

The McDonald Report found a similar disparate impact on minorities. Between July 7, 2013 and July 15, 2016, 7.8 percent of Black applicants failed the SSA or DDS exact-match procedures, 6.1 percent of Hispanic applicants failed, and 4.2 percent of Asian or Pacific Islander applicants failed. (McDonald Report at 17-18.)  During this same time, only 0.9 percent of White applicants failed the exact-match procedures. (McDonald Report at 18.)  This failure rate for Black applicants was over nine times greater than for White applicants. (McDonald Report at 18.)  In fact, every minority group, including American Indian or Alaskan Native and Other, had a significantly higher failure rate than White applicants. (McDonald Report at 17-18.)[11]

> iii. *The disparate impact of Georgia's verification procedure on minority voters is caused by and linked to social and historical conditions producing discrimination against minority applicants.*

The causal question is whether a challenged practice "interacts with social and historical conditions" to produce an "inequality in the opportunities enjoyed by black and white voters." *Gingles*, 478 U.S. at 47.  In Georgia, social and economic

---

[11.] When analyzing the data, Dr. McDonald considered the flat-file nature of the cancelled data file and on this basis did not include all the records in his analysis. (McDonald Report at 15 n.17.)  This explains a few variations between Dr. McDonald's report and Mr. Brills' report; however, even using slightly different approaches, both experts found the same clearly disproportionate impact on minority voter registration applicants because of Georgia's verification procedure.

conditions caused by historical and ongoing discrimination, including poverty, unemployment, lower educational attainment, and lack of access to transportation, cause minority voters to be disproportionately burdened by the verification procedure.

Historical discrimination in Georgia, including by the State of Georgia, has resulted in a disparity between White and Black ownership rates of driver's licenses and other Georgia photo identifications. During the pendency of the Georgia photo-identification litigation, the Secretary of State's office issued a press release reporting that a database match between the State's file of registered voters and the DDS data file of persons issued valid Georgia driver's licenses or Georgia ID cards revealed that 676,246 registered voters either had no record of a driver's license or ID issued, or had their licenses revoked, suspended, canceled, denied, or surrendered. *Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1311 (N.D. Ga. 2006). While 27.8 percent of the voters on the registration list were Black, 35.6 percent of voters who lacked a driver's license or Georgia ID card were Black. *Id.*

Because Black voter registration applicants are less likely than White applicants to own a Georgia driver's license or state ID card, they are more likely to be relegated to the error-prone SSA matching process. (*See generally* IG Report.) Compounding the problem, when a failure to match is based on the

31

applicant's social security number, the letter informing the applicant of the mismatch does not specify the information that failed to match. This makes it harder for affected minority voters to identify and correct errors.

Moreover, 73 percent of applicants that failed the matching procedures live in Georgia communities with a lower than average per capita income. (Brill Report at 9.) Black ($19,902) and Hispanic ($22,884) applicants who failed the matching procedures reside in communities with lower per capita income than White applicants ($27,982). (McDonald Report at 25.)

Other social conditions also interact with the matching procedures to cause a disparate impact on minorities. While 3.18 percent of all voter registration applications that failed the SSA matching procedures and 3.27 percent that failed the DDS matching procedures had a hyphenated last name, only 1.01 percent of the total applications had a hyphenated last name. (Brill Report at 6.) At the same time, only 0.44 percent of White voters, but 1.47 percent of Black voters and 7.02 percent of Hispanics voters, had a hyphenated last name. (Brill Report at 6.) Minority applicants are more likely to have hyphenated last names and applicants with hyphenated last names fail the matching procedures at a higher rate. "Blacks and Hispanics are thus disadvantaged by the DDS first and last name exact match procedure. When [spaces, hyphens, and apostrophes] are present their names are

more likely to fail the DDS first or last name exact match than Whites."
(McDonald Report at 21.)

Unsurprisingly, White voter participation in competitive Georgia statewide, county, and municipal contests significantly exceeds Black voter participation.[12]

> iv.    The Gingles *factors support the conclusion that the verification procedure abridges the voting rights of minorities in Georgia.*

Most or all of the "non-exclusive" factors identified by the Supreme Court in *Gingles*,[13] as well as other similar factors, are present here.

> (a)    <u>There is a history of discrimination in Georgia.</u>

Disparities in socioeconomic status and voter participation in Georgia are the direct result of an unfortunate history of pervasive racial discrimination, which has frequently resulted in judicial intervention to restore the lawful rights of citizens. With respect to education, more than 80 Georgia counties were required

---

12. For example: (i) the white turnout rate in statewide elections was 16.9 (2016 presidential primary), 7.1 (2014 general), and 3.1 (2012 general) percentage points greater than the Black turnout rate; (ii) the white turnout rate in statewide elections was 22.7 (2016 presidential primary), 27.0 (2014 general), and 19.2 (2012 general) percentage points greater than the Latino turnout rate; and (iii) the white turnout rate in statewide elections was 29.6 (2016 presidential primary), 26.2 (2014 general), and 20.9 (2012 general) percentage points greater than the Asian-American turnout rate. *Voter Turn Out by Demographics*, GA. SEC'Y OF STATE, http://sos.ga.gov/index.php/Elections/voter_turn_out_by_demographics.

13  See p. 21, n.6, *supra*.

to desegregate as part of a 1969 school segregation case brought by the U.S. Department of Justice. *See United States v. Georgia*, C.A. No. 12972 (N.D. Ga. 1969); *United States v. Georgia*, 466 F.2d 197 (5th Cir. 1972); *Desegregation of Public School Districts in Georgia*, GEORGIA ADVISORY COMMITTEE TO THE UNITED STATES COMMISSION ON CIVIL RIGHTS 21 (Dec. 2007), http://www.usccr.gov/pubs/GADESG-FULL.pdf.

The history of voting discrimination in Georgia is also well documented. The United States District Court for the Southern District of Georgia has noted that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases." *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (citing *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560-61, 1571 (S.D. Ga. 1994)). The history of voting discrimination between 1982 and 2006 was detailed in various reports during the 2006 reauthorization of the Voting Rights Act.[14]

In a 2013 decision concerning a Section 2 challenge to Georgia's election practices, the District Court for the Northern District of Georgia stated:

---

14. *See The Case for Extending and Amending the Voting Rights Act*, AM. CIVIL LIBERTIES UNION 108-479 (March 2006), https://www.aclu.org/files/pdfs/votingrightsreport20060307.pdf; Robert Kengle, *Voting Rights in Georgia 1982-2000*, RENEWTHEVRA.ORG (March 2006), http://www.protectcivilrights.org/pdf/voting/GeorgiaVRA.pdf.

> The history of the states of segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof.  Generally, Georgia has a history chocked full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.  Yet, Georgia has come a long way since the adoption of the Voting Rights Act of 1965 and many of the evils of Georgia's discriminatory history have been corrected. Unfortunately, some remnants remain.

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) (internal quotation marks omitted).  There is also a history of hostility by the Georgia Secretary of State's office towards third-party voter registration activities conducted by minority organizations.  *See, e.g.*, *Charles H. Wesley Education Foundation v. Cox*, 408 F.3d 1349, 1354-56 (11th Cir. 2005) (upholding decision granting plaintiff's, a largely African-American fraternity, motion for a preliminary injunction to prevent the Georgia Secretary of State's office from refusing to accept voter registration applications).

In 2005, Georgia adopted a photo identification requirement (the "2005 photo ID law").  The 2005 photo ID law required individuals lacking photo ID to pay $20 for a photo ID card or to sign an affidavit declaring indigency.  *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1367-69 (N.D. Ga. 2005).  The U.S. District Court for the Northern District of Georgia held that plaintiffs established a likelihood of success on the merits of their claims that the 2005 photo ID law

violated the Twenty-fourth Amendment and the Equal Protection Clause of the

Fourteenth Amendment. *Id*. at 1370. In response to the court's opinion, Georgia

revised the photo ID law in 2006. *See Common Cause/Ga. v. Billups*, 554 F.3d

1340, 1352-55 (11th Cir. 2009) (upholding the revised 2006 photo ID law).

      The origins of the verification procedure are part of this history of

discrimination. The Georgia Secretary of State's office began implementing a

predecessor version of the verification procedure shortly before the 2008

presidential election, without first obtaining preclearance from the U.S.

Department of Justice. The U.S. District Court for the Northern District of

Georgia held that doing so violated Section 5 of the Voting Rights Act. *Morales v.

Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *8 (N.D. Ga. Oct. 27, 2008).

      The U.S. Department of Justice thereafter concluded that the initial version

of the program relied on error-laden and "possibly improper" usage of the Social

Security Administration's HAVV system and outdated Georgia Department of

Driver Services data in an attempt to find non-citizens. Letter from Loretta King,

Acting Assistant Att'y Gen., Dep't of Justice, to Thurbert E. Baker, Ga. Att'y Gen.

(May 29, 2009), https://www.justice.gov/sites/default/files/crt/legacy

/2014/05/30/l_090529.pdf). The letter concluded that the "flawed system

frequently subjects a disproportionate number of African-American, Asian, and/or

Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote." (*Id.* at 4.)[15]

> (b)   Voting patterns in Georgia are racially polarized.

Courts have repeatedly held that racially polarized voting exists at the statewide, county, and local levels in Georgia. *See*, *e.g.*, *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 88 (D.D.C. 2002), *rev'd on other grounds*, 539 U.S. 461 (2003) (finding "that the evidence of racial polarization suggests the likelihood of retrogression"); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs,* 950 F. Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (finding that racially polarized voting exists in Fayette County, Georgia), *vacated and remanded on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *Hall v. Holder*, 955 F.2d 1563, 1571 (11th Cir. 1992) (finding that racially polarized voting exists in Bleckley County, Georgia), *vacated and remanded on other grounds*, 512 U.S. 874 (1994).

---

15. The Georgia Secretary of State's office subsequently modified some aspects of the program, and submitted a new version for preclearance. The Department of Justice precleared the revised verification procedure in 2010. The standard of review used under Section 5 is different than the standard under Section 2. Under Section 5, a jurisdiction must show that its voting change was neither adopted with a discriminatory purpose nor would have a discriminatory effect. 52 U.S.C. § 10304(b). Preclearing a voting change does not preclude a subsequent action under Section 2. 52 U.S.C. § 10304(a) ("Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.").

> (c)     The socio-economic effects of
> discrimination in Georgia are pervasive.

There are significant racial disparities in the State with respect to education and home- and vehicle- ownership rates. The Census Bureau's 2014 American Community Survey five-year estimate ("ACS") demonstrates, for example that while only 11.3 percent of White residents in Georgia did not graduate from high school, 16.3 percent of Black residents and 41.8 percent of Latino residents did not. Further, while 32.1 percent of White residents graduated from college, only 20.8 percent of Black residents and 14.2 percent of Latino residents did so. *2010-2014 American Community Survey 5-Year Estimates*, Tables C15002B, C15002D, C15002H, C15002I, U.S. CENSUS BUREAU, *available at* https://www.census.gov/ programs-surveys/acs.

ACS data also demonstrate that while 74.4 percent of White households in Georgia are homeowners, the homeownership rate is 48.1 percent among Black households, 43.7 percent among Latino households, and 63.0 percent among Asian-American households. *2009-2013 American Community Survey 5-Year Estimates*, Tables B25003B, B25003D, B25003H, B25003I, U.S. CENSUS BUREAU, *available at* https://www.census.gov/programs-surveys/acs. While only 3.5 percent of White households are without a car, the rate is 13.3 percent of Black households, 8.7 percent of Latino households, and 4.5 percent of Asian

households.  *2006-2010 American Community Survey 5-Year Estimates*, Table

DP04, U.S. CENSUS BUREAU, *available at* https://www.census.gov/programs-

surveys/acs.

(d)     Minorities in Georgia are less
         <u>likely to be elected to public office.</u>

Minorities (Blacks, Latinos, and Asian-American) have long been

underrepresented in public life in Georgia.  *See, e.g.*, *Busbee v. Smith*, 549 F. Supp.

494, 498-515 (D.D.C. 1982).  While there has been some progress, minorities

remain underrepresented.

Although according to the 2010 Census, 59.7 percent of the Georgia

population is White, 30.5 percent is Black, 8.8 percent is Latino and 3.2 percent is

Asian, (*see QuickFacts: Georgia (2010)*, U.S. CENSUS BUREAU,

http://www.census.gov/quickfacts/table/PST045215/13 (last visited Sept. 13,

2016)), there has never been a Black, Latino, or Asian United States Senator from

Georgia.  From 2005-2006 through the present, approximately 12 of the 56 seats

(21 percent) available in the Georgia State Senate have been held by minorities at

any given time (mostly Black, with one Latino and no Asian).  Similarly,

approximately 49 of the 180 seats (27 percent) available in the Georgia House of

Representatives have been held by minorities at any given time (mostly Black,

with one Latino and one Asian).  Moreover, going back to 1965, there has been

39

only one minority to hold significant state-wide elected office in Georgia.  Since 1965 only one Black individual has held the office of Governor, Lieutenant Governor, Secretary of State, or Attorney General—former Attorney General Thurbert Baker.[16]

        (e)     Georgia's elected officials are unresponsive to the <u>particularized needs of Georgia's minorities.</u>

The Georgia Secretary of State's office has been aware of concerns that verification procedure disproportionately burdens minority voters.  (*See, e.g.*, Houk Decl.)  Despite initially agreeing to modify the verification procedure, the Secretary has failed to remedy the aspects of the program that impose disproportionate burdens on minority voters.  (Houk Decl. ¶¶ 9-18.)

In *Cox*, a charitable and educational organization filed suit against former Georgia Secretary of State Cathy Cox for refusing to accept 64 completed voter registration applications submitted by the organization.  408 F.3d at 1351.  The

---

16 This information was compiled through reviewing a variety of websites, including the Georgia Legislative Black Caucus Member Directory (http://www.galbc.org/home/glbc-committees/members/), the Georgia State House of Representatives Membership List, (http://www.house.ga.gov/Representatives/en-US/HouseMembersList.aspx) and Georgia State Senators Membership List, (http://www.senate.ga.gov/senators/en-US/SenateMembersList.aspx).  Additionally, the Georgia Attorney General History (http://law.ga.gov/history) was consulted.  Similar websites were used to determine the racial make-up of elected representatives for U.S. Congress, Georgia Secretaries of State, and the Governors and Lieutenant Governors of Georgia.

Eleventh Circuit upheld the District Court's order granting plaintiffs' motion for a preliminary injunction, concluding that the plaintiffs had established a substantial likelihood of success on their claim that refusing to accept the applications violated the National Voter Registration Act. *Id.* at 1354.

Beyond ignoring needs, Georgia officials have attempted to punish minority voter outreach. In 2010, the Georgia Secretary of State's office aggressively pursued an investigation of a dozen Black voting organizers in Brooks County that led to a criminal prosecution. *See* Ariel Hart, *Voting Case Mirrors National Struggle*, ATLANTA JOURNAL-CONSTITUTION, Dec. 13, 2014, http://www.myajc.com/news/news/state-regional-govt-politics/voting-case-mirrors-national-struggle/njRG6/. Although the organizers were ultimately exonerated, they were initially charged with more than 100 election law violations and faced more than 1,000 combined years in prison. *Id.* The Georgia Attorney General subsequently acknowledged that the organizers' alleged crime is in fact entirely permissible under state law. Cristina M. Correia, Esq., Assistant Att'y General, Official Opinion 2016-2 (June 15, 2016), http://law.ga.gov/opinion/2016-2.

(f)    The relationship between the verification
program and its stated goals is tenuous.

Georgia's stated goals in implementing its voter registration verification

procedures are to "assure the identity and eligibility of voters and to prevent

fraudulent or erroneous registrations." (Section 5 Submission at 3.) Existing

federal and state law and state election procedures, however, already accomplish

these goals, including Georgia voter-identification law that requires all voters to

verify their identity (*see* O.C.G.A. §§ 21-2-220 and 21-2-417) and Georgia's

procedure for voters whose applications fail to match within 30 days before an

election.

Voters whose applications fail to verify within 30 days of an election may

verify their information at the polls. Thus, Secretary Kemp cannot identify any

way that turning away at the polls voters whose applications fail to match *more*

than 30 days before an election serves Georgia's legitimate interests in a way that

is not equally served by allowing those voters to present appropriate

documentation at the time of voting.

Moreover, voter fraud has never been shown to be a problem in Georgia.

Former Georgia Secretary of State Cathy Cox has noted that there had been no

documented cases of "fraudulent voting by persons who obtained ballots

unlawfully by misrepresenting their identities as registered voters to poll workers

reported to her office during her nine years as Secretary of State." *Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1304 (N.D. Ga. 2006). Likewise, a recent report by the non-partisan journalism project News21 reviewed hundreds of allegations of voter fraud in five states, including Georgia, and found that "none of the prosecuted cases involved voter impersonation." Celeste Headlee & Sean Powers, *Report: Voter Fraud Not Widespread,* GPB NEWS, Aug. 30, 2016, http://gpbnews.org/post/report-voter-fraud-not-widespread.

### B. The Verification Procedure Unconstitutionally Burdens the Fundamental Right to Vote.

The right to vote "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. . . . Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964).[17]

Accordingly, the courts have developed a balancing test to prevent the unjustified

---

17. The right to vote includes the right to register. *See United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967). In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

burdening of the right to vote—a test that the verification procedure fails on both ends of the scale.

### i. The Anderson-Burdick Test

A State may not place any burdens on the right to vote that are not adequately justified by the State's asserted interests. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). When considering challenges to state election laws that burden the fundamental right to vote, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789); *see also Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012).

The *Anderson-Burdick* framework is a "flexible" sliding scale, in which the "rigorousness of [the court's] inquiry" increases with the severity of the burden. *Burdick*, 504 U.S. at 434. When a state imposes a severe burden, strict scrutiny applies and any burdensome action must be narrowly tailored to advance a compelling state interest. *See id.* Secretary Kemp's verification procedure severely burdens the fundamental right to vote of Georgia residents, particularly

minority applicants, without advancing any legitimate state interests and thus is subject to strict scrutiny.  *See Dunn v. Blumstein*, 405 U.S. 330, 337 (1972).

> ii.    *The Verification Procedures Severely*
> *Burden the Fundamental Right to Vote.*

The verification procedure severely burdens the right to vote. (*See* Section I.A.i.)  For many applicants, any error in the procedure, even if caused by other persons or by the system itself, is tantamount to disenfranchisement.  Applicants whose voter registration applications fail to match with the information contained in the DDS or SSA databases are required to be mailed deficiency letters, but these letters do not clearly inform the applicant of the specific information that did not match.  Thus, where the mismatch is the result of a database error and not the information on the application, there is no way for the applicant to diagnose and cure the mismatch—resulting in the disenfranchisement of eligible voters.  This represents a severe burden on eligible voters' rights to vote.

> iii.    *The Verification Procedure Is Unjustified.*

Because the burdens imposed are severe, Secretary Kemp's verification procedure must be narrowly tailored to advance a compelling state interest.  *See Burdick*, 504 U.S. at 434.  But even if the burdens imposed on eligible voters by the verification procedure were considered less than severe, it would not relieve the State of the obligation to offer a justification that outweighed those burdens.  *See*

*id.* (courts must evaluate "the extent to which [state] interests make it *necessary* to burden the plaintiffs' rights" (emphasis supplied)).  The verification procedure is so arbitrary and so unnecessary to advance any state interest that it would not pass the *Anderson-Burdick* test, even under the most lenient scrutiny.

Georgia's stated justification for its verification procedure is to "assure the identity and eligibility of voters and to prevent fraudulent or erroneous registrations." (Section 5 Submission at 3.)  As discussed *supra* (Section I.A.iii(f)), Georgia's existing election laws already protect this interest.

The asserted justification for the verification procedure is also undermined by the disparate treatment of similarly situated Georgia residents, some of whom are permitted to cure defects in the registration process at the time of voting while others are not.  There is no legitimate state interest that justifies this arbitrary treatment of eligible Georgia residents based merely on the timing (whether more or less than 30 days before the election) of a purported failure to match.  *See Bullock v. Carter*, 405 U.S. 134, 141 (1972) (in regulating elections, state's "power must be exercised in a manner consistent with the Equal Protection Clause.").

## II.    Plaintiffs Will Suffer Irreparable Harm Absent the Requested Relief.

The violation of a citizen's right to vote is the quintessential injury justifying an injunction.  *See, e.g.*, *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th

Cir. 2000) ("[B]y finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made."); *Common Cause/Ga.*, 406 F. Supp. 2d at 1376 ("[T]he right to vote is a fundamental right and is preservative of all other rights.  Denying an individual the right to vote works a serious, irreparable injury upon that individual.").

Many applicants have already had their registrations "cancelled" and will be unable to vote on November 8.  As of July 15, 2016, 7,696 voter registration applications were listed as "pending" in Georgia's voter registration system for failing the verification procedure, and a ticking clock will now lead to disenfranchisement under Secretary Kemp's procedures.  More applications will fail in the coming weeks.  All of these unfairly disenfranchised voters will suffer an injury that can never be undone. *See Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wa. 2006) (finding irreparable harm where applicants were rejected for failing to match with motor vehicle or SSA databases).

Plaintiffs will also suffer irreparable injury distinct from the injuries of eligible voters if this Court does not grant injunctive relief.  With each eligible voter denied access to the polls, the verification procedure will continue to frustrate registration and mobilization efforts critical to Plaintiffs' organizational missions.

The mobilization opportunities that will be lost during the 2016 presidential election cycle cannot otherwise be remedied. *See Common Cause/Ga.*, 406 F. Supp. 2d at 1365-66.

### III.   Secretary Kemp Will Not Be Harmed by the Requested Relief.

Secretary Kemp will not be harmed if the Court grants the requested relief. By enjoining Secretary Kemp from preventing eligible Georgia residents who present valid identification from voting merely because their forms purportedly did not match, Plaintiffs seek only to ensure that eligible residents who submit timely voter registration applications and can actually prove their identity at the time of voting are allowed to vote. Secretary Kemp's procedure already allows eligible voters whose applications fail to match within 30 days of the election to verify their identity at the polls. Plaintiffs merely ask that this common-sense solution be applied to all applicants who fail the verification procedure.[18]

### IV.   The Public Interest Weighs Heavily in Favor of Granting the Requested Relief.

The public interest will be best served by a procedure that allows every eligible resident of Georgia to register and cast a vote, thereby preserving this fundamental right and fostering trust in the integrity of the elections. *See*

---

[18] Because Secretary Kemp will not suffer monetary loss due to the entry of the requested preliminary injunctive relief, a bond is not required under Rule 65(c) of the Federal Rules of Civil Procedure.

*Washington Ass'n of Churches*, 492 F. Supp. 2d at 1271; *Wesley*, 408 F.3d at 1355;

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d

1338, 1348–49 (N.D. Ga. 2015); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635

F.3d 219, 244 (6th Cir. 2011).

In sum, the present case is another in a long line in which federal courts have

stood as the last and best bulwark against deprivation of fundamental rights

guaranteed to citizens under the Constitution and laws of the United States.  Only

if appropriate relief is granted by this Court can justice be done to protect the rights

of citizens to cast their votes—rights that must be exercised on November 8 or lost

forever.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court

enter an order granting their motion for a preliminary injunction and such further

relief as it deems just and proper.

DATE:  September 14, 2016                Respectfully Submitted,


 By:   */s/ James W. Cobb*
James W. Cobb
Georgia Bar No. 420133
Amy Michaelson Kelly
Georgia Bar No. 215108
T. Brandon Waddell

Georgia Bar No. 252639
Caplan Cobb LLP
75 Fourteenth Street, N.E.
Atlanta, Georgia 30309
Telephone:          (404) 596-5600
Facsimile:          (404) 596-5604
jcobb@caplancobb.com
akelly@caplancobb.com
bwaddell@caplancobb.com

Ezra D. Rosenberg (*pro hac vice – to be filed*)
Julie Houk (*pro hac vice – to be filed*)
John Powers (*pro hac vice – to be filed*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue NW, Suite 400
Washington, D.C. 20005
Telephone:          (202) 662-8600
Facsimile:          (202) 783-0857
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
jpowers@lawyerscommittee.org

Michelle Kanter Cohen (*pro hac vice – to be filed*)
Sarah Brannon* (*pro hac vice – to be filed*)
Niyati Shah** (*pro hac vice – to be filed*)
Project Vote
1420 K Street NW, Suite 700
Washington, D.C. 20005
Telephone:          (202) 546-4173
Facsimile:     (202) 733-4762
mkantercohen@projectvote.org
sbrannon@projectvote.org
nshah@projectvote.org
*Authorized to practice only in Maryland.*
*Practice in DC limited to cases in federal court.*
**Admitted in New Jersey & New York.*
*Practice in DC limited to cases in federal court.*

Vilia Hayes (*pro hac vice – to be filed*)
David Wiltenburg (*pro hac vice – to be filed*)
Gregory Farrell (*pro hac vice – to be filed*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:   (212) 837-6000
Facsimile:    (212) 422-4726
vilia.hayes@hugheshubbard.com
david.wiltenburg@hugheshubbard.com
gregory.farrell@hugheshubbard.com

J. Gerald Hebert (*pro hac vice – to be filed*)
Danielle Lang (*pro hac vice – to be filed*)
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, D.C. 20005
Telephone:          (202) 736-2200
Facsimile:          (202) 736-2222
GHebert@campaignlegalcenter.org
DLang@campaignlegalcenter.org

Aderson B. Francois (*pro hac vice – to be filed*)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, D.C. 20001-2075
Telephone:  (202) 661-6701
Facsimile:  (202) 662-9634
abf48@law.georgetown.edu

*Counsel for Plaintiffs*

## **RULE 7.1 CERTIFICATION**

I hereby certify that the foregoing was prepared in accordance with the font and point selections approved by the court in Local Rule 5.1B.

/s/ James W. Cobb
James W. Cobb

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September, 2016, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system and have

caused a copy to be delivered to the Secretary of State by hand-delivery at:

Brian Kemp
Georgia Secretary of State and Chief Election Official
c/o Sam Olens, Attorney General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

*/s/ James W. Cobb*
James W. Cobb